W. H. LANGFORD, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. On the trial of an accused for uttering an instrument having on it forged endorsements, knowing at the time that they were forged, and with an intent to defraud and injure, the utterance by the defendant near the same time, but previously, of other notes with forged endorsements, and his possession and attempting to negotiate subsequently, but near the same time, another note with forged endorsements on it, and a guaranty to one of the makers thereof with forged signatures, are admissible as evidence that defendant knew, when he uttered the instrument described in the information, that the endorsements were forged, and of a criminal intent in uttering the same.

2. Evidence that the accused had, at the time of uttering the forged instrument described in the information, knowledge that other forged instruments testified to have been uttered by him or to have been in his possession and used by him were forgeries, is not necessary to entitle the consideration of the latter by the jury.

3. An instruction to the effect that if the jury found the former life of the accused was such that the criminal act charged would not naturally and reasonably find place in it, they might permit such conclusion to raise a reasonable doubt of his guilt, although the evidence satisfied them that he had committed the act charged, and if it did raise such a doubt they must ac-

quit, is not a charge upon the law of the case, nor is it correct as a principle to guide the jury in reaching a verdict; and was properly refused.

4. Testimony as to previous excellent character of the accused will not justify interference with a conviction where, conceding such character, it is fully supported by the evidence.

Writ of Error to the Criminal Court of Record for Escambia county.

STATEMENT.

The first count of the information charges the plaintiff in error with forgery, and on this count there was a verdict of acquittal. The second count charges that W. H. Langford on July 19th, 1893, in Escambia county, in this State, having in his possession a certain instrument of the stated date, and purporting to be made at Pensacola, Florida, and set out in full, and which, so far as its legal import need be given, is a promise of Langford to pay to the order of Lee Daniell, at the First National Bank of Pensacola, $500, six months after date, with interest at the rate of ten per cent. from date until paid, with a waiver of demand and protest, and notice of demand, non-payment and protest, and an agreement to pay all costs of collection, including ten per cent. attorney's fees, and such instrument having on its back a false, forged and counterfeit endorsement in the following words: "Antonio Rierra," "Richard Swaine," "J. M. Crona," did then and there, well knowing the said endorsements to be false, forged and counterfeit, utter and publish the same to one Lee Daniell as true, with the intent of him the said Langford then and there to injure and defraud, against the form, etc. Upon this count the jury returned a verdict of guilty with a recommendation of mercy; and a motion for a new trial having been de-

nied, the court sentenced the accused to imprisonment in the county jail at hard labor for the period of twelve months, and to this judgment a writ of error has been brought.

Upon the trial Lee Daniell, a State witness, testified that about July 17th, 1893, the accused told him that he needed $500 in his business to carry him through the summer, and asked him to let him have it, and offered to give him his note with Richard Swaine's endorsement. Witness not being satisfied with this security, the defendant offered to have Anthony Rierra, also, endorse the note; and on the 19th of July, witness being satisfied with the endorsements, gave the accused his check for $500, and the accused gave witness the note or instrument described in the information, which instrument was put in evidence. Richard Swayne testified that he did not sign his name on the instrument, or authorize any one else to do so. That he had conversations with defendant about his name being on some paper, but can not say it was with reference to this particular paper. That defendant approached him at one time on Palafox street and begged him for God's sake to acknowledge the name of Richard Swaine as witness' signature, and if not for his sake, for the sake of his father and mother. James Crona testified that he did not put his name on the paper, or authorize any one else to do so. Anthony Rierra testified that his name was Anthony, and not Antonio, Rierra, and that he did not write or authorize it to be written on the note, and that he was the only person named Anthony Rierra in Pensacola, and never knew or heard of any one named "Antonio Rierra."

The State then recalled Daniell, who identified a certain note dated Pensacola, Fla., June 5, 1893, whereby William Blumer and H. Blumer promised to

pay to the order of W. H. Langford $180, with interest at ten per cent. six months after date, at the Citizens National Bank, with provisions as to waiver and costs and attorney fees as above, and endorsed: "W. H. Langford," "Richard Swaine," and stated that he discounted it for Langford, getting it from him near the time that he got the $500 note, and paying him money for it. Richard Swaine being recalled stated that he did not write his name or authorize it to be written on the note. R. M. Cary, Jr., a witness for the State, identified a note dated Pensacola, Fla., July 5th, 1893, whereby W. H. Langford promises to pay at the bank last named to the order of Richard Swaine, ten days after date, $200, with similar waiver and provisions as to costs and attorney's fees, and purporting to be endorsed: "Richard Swaine." Cary testified that he recognized the note as one he discounted for defendant through L. W. Williams, the latter asking witness to let him have $200 on good paper, stating that Langford had requested him as a friend to see about it, saying that Langford needed the the money and could give Richard Swaine as an endorser, and witness replying that it would be satisfactory; and Williams bringing witness the note with Swaine's endorsement on it and getting the money. Cary also testified that in the law office of William Fisher, after witness' conversation with Swaine, the defendant acknowledged to witness that this note and others passed by him were forgeries. L. W. Williams deposed that he was a personal friend of defendant, who told witness that he needed money in his business, and asked witness to suggest some one from whom he could get it, and witness named R. M. Cary, Jr., who had been discounting good paper, and defendant asked witness to see Cary, who did so and found

he could get the money on note with Swaine's endorsement. That Langford handed to 'witness the note, with the endorsement, and witness went to Cary and got the money on it, less a bonus charged and retained by Cary for discounting the note. Witness did not see Swaine endorse the note; did not charge or receive any commission for having the note discounted for Langford, but gave him all the money he obtained from Cary. Swaine testified that the name, Richard Swaine, endorsed on this note was not written by him or by his authority. A. C. Blount, Jr., identified the following instruments: 1st. A promissory note signed by W. H. Langford, dated Pensacola, Fla., August 8th, 1893, for $1,000 and interest at ten per cent., payable five months after date to the order of Joseph Wilkins at the bank last named, at the rate of $200 per month until paid, with a similar provision of waiver and as to costs and attorney's fees, and endorsed "Antonio Rierra," "Robt. H. Langford," "J. M. Crona," "Thos. Johnson," "Richard Swaine," "Mrs. S. Swaine," and "A. C. Blount, Jr." The two last names being, the bill of exceptions states, crossed out. 2nd. A written instrument dated Pensacola, August 11th, 1893, and purporting to be signed by Robt. H. Langford, Antonio Rierra, Richard Swaine and Thos. Johnson, and to bind them and each of them in consideration of A. C. Blount, Jr., agreeing to endorse the note just described, which note is stated to have been endorsed by said four parties, to pay said note when due, if not paid by W. H. Langford, and to hold Blount harmless against all liability upon such note, and not to call on him for contribution, and in the event of suit on the note to pay all costs and charges secured thereby. Blount also testified that his endorsement, though now scratched out, was gen-

uine; that the defendant brought him the note, with the names preceding his own endorsed thereon, and asked witness to give him his endorsement, that Joseph Wilkins was not satisfied to let him have the money on the note with the endorsements on it, but would be satisfied if witness should endorse it; and that the defendant offered to have the other endorsers give witness a guaranty to save him from liability, and that he endorsed the note at the request of defendant, who gave him the guaranty above set forth for his protection. That witness scratched out his name after he learned that the other endorsements were forgeries. That witness wrote the guaranty and gave it to defendant to have it signed, and the latter left the office for this purpose and returned with it signed, and said that he had seen all the endorsers except Crona, and asked witness if he would take it as it was. That witness was satisfied at the time that the names endorsed on the note and signed to the guaranty were genuine. That the four names to the guaranty that are on the back of the note are in the same handwriting respectively. That after rumors of the alleged forgeries had become current the defendant visited witness' office with Joseph Wilkins, the sheriff, and acknowledged that he had signed the endorsements to the note and signatures to the guaranty, and witness asked him why he had signed the names of other parties to the paper, and his reply was that he thought he had a right to do it. Richard Swaine testified that his name on the last note and the guaranty was not written by him or by his authority. That in a conversation the defendant asked witness to admit that the name Richard Swaine on said papers was his signature, to admit it for the sake of his father and mother, but witness refused to do so.

In behalf of the defendant, D. W. Rielly testified that he had known defendant for many years in the city of Pensacola, had known him as an employe of the Western Union Telegraph Company, where witness was also employed; and that defendant's reputation in such employment among the employes and persons connected with the business, and also with the community at large, for honesty, morality and truthfullness was excellent up to the time of the forgeries charged against him; and that he had never heard it questioned. Len LeBaron, the manager of the above named telegraph company at Pensacola, and who had known defendant for many years in Pensacola, defendant being employed in the company's office for several years, testified that he had the highest opinion of defendant, and that his reputation in the office and with those connected with it and in the community, up to the alleged forgery was of the very best for honesty and morality. R. F. McConnell, who had known defendant for years, and in whose employ defendant had been for a while in the management of the Pensacola opera house, and M. G. Bonifay, who had known defendant ever since he was a child, knowing him also in the employ of L. Hilton Green, a timber merchant in Pensacola, where witness was also employed, and the said Green, who at the time of testifying was president of the Citizen's National Bank, and in whose employ the defendant was for several years when witness was a timber merchant, each testified in substance that they had found the defendant honest and reliable, and that his reputation for honesty, one saying for honesty and morality, up to the time of the forgeries was of the very best, and that they had never heard it questioned; and H. B. Hatton, J. T. McConnaghy, Alfred Rouch, George Bonifay and Emile

Roch, all testified that they had known the defendant for years prior to the alleged forgeries and known his reputation for honesty and morality in the community where he resided, and that it was of the very best, and had never heard it questioned.

The defendant also made a statement in his own defense as follows: I am innocent of forgery. I did not commit the forgery of the notes that have been produced here. I believed the names were all genuine when I used the papers. I needed money in my business and obtained it on the notes. I paid a party to get the endorsers for me, and believed the endorsements were genuine. I did not know they were forged. I had no suspicion of anything being wrong. I will not divulge the name of the party who got the endorsements for me. I will die before doing so. I will not bring on his parents such suffering as has been brought on mine. I stated to Mr. Cary that the notes were forgeries because I had at that time found out that they were so. I did not know it before. If I said to Mr. Blount that I thought I had a right to sign the names of the parties, it was to shield the guilty person. The second day after the rumors of the forgeries were heard on the streets I received the following letter through the mail.

This letter, omitting, as we deem it proper to do, a part thereof, is as follows:

*Mr. W. H. Langford, Pensacola, Fla.*

DEAR SIR: We have learned since yesterday that it is your intention to expose the person whome you had dealings with and make him suffer we take this method to inform you that any such steps will be *avenged* by us—* * * LEADER.

8-13-93.

This letter impressed me and deterred me from doing anything that would bring trouble to the young lady referred to, to whom I was engaged to be married. I am entirely innocent of any intent to commit crime. I desire to exhonorate Mr. L. W. Williams who placed the note with Cary for me of any complicity in or knowledge of the forgery.

The other facts in the case are stated in the opinion of the court.

*John C. Avery* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

RANEY, C. J.:

As is shown by the preceding statement the instrument, the endorsement of which is alleged to have been forged, and which instrument so endorsed is charged to have been uttered by the defendant with the knowledge of such forgery, and with intent to injure and defraud, bears date July 19th, 1893, at Pensacola in this State, and is for $500, with interest as stated, payable to the order of one Lee Daniell at the First National Bank there, six months after date, with waiver of demand, protest and of notice thereof and of non-payment, and an agreement as to costs and attorney's fees. The proof shows that it was uttered on the day of its date by the defendant, and that the endorsement was forged.

The first error assigned is as to the admission in evidence, on behalf of the State, of the other instruments described in such statement, and severally bearing date June 5th, July 5th, August 8th, and August 11th, 1893. The proof as to the forgery of the Richard

16

Swaine endorsement on the first of these instruments, and the uttering of the same by defendant, about the same time he uttered the instrument described in the information, is clear; and the same is true as to the Swaine endorsement on the instrument of July 5th, 1893, and the uttering of this instrument by defendant, and as to the forgery of the Swaine endorsement on the instrument of August 8th, 1893, and of his signature to the guaranty of August 11th of the same year, and the uttering of the latter instrument by defendant. The admission of each one of these four instruments was objected to on the ground that it was irrelevant, impertinent and inadmissible. In Steele vs. People, 45 Ill., 152, it was held to be proper, on a trial upon an indictment for forging checks, to admit evidence of the defendant's having passed other forged checks about the time of the forgery charged; and in McCartney vs. State, 3 Ind., 353, the decision was that upon the trial on a similar indictment, the state, in order to show the defendant's criminal intent, may prove that about the time the particular bill was passed he uttered other counterfeit bills on the same bank and other banks; and further that the fact of indictments against the defendant were pending or had been tried, for passing such other bills, did not affect the admissibility of the evidence; and in State vs. Houston, 1 Bailey, 300, on a trial of an indictment for uttering and publishing a forged promissory note, knowing it to be forged, the ruling of the trial judge permitting evidence to show that another note passed by the defendant had been forged, although he had been acquitted at a former term on an indictment for uttering the latter note, was sustained; and in the opinion it is said: "It is true, as a general rule, that when a man is on his trial for one offense, it is not competent to

prove that he has committed other distinct and substantive offenses. But in such cases as the present, it is competent, in order to prove the *scienter*, to show that the prisoner has passed other counterfeit notes of a similar character, and that he has such in his possession; for although these may be the foundation of other prosecutions, yet they afford evidence, and sometimes very strong evidence, of the knowledge of the falsity of the paper, on which the indictment is founded. * * * One may by accident come into the possession of a single counterfeit note, or coin, but when he is possessed of many, or passes many, it must be attributed to something more than accident;" and in Commonwealth vs. Coe, 115 Mass., 481, where the indictment was for cheating by falsely pretending that a forged certificate of stock was genuine, evidence of the possession and use by the defendant of other forged certificates of stock about the same time, whether before or afterwards, is held admissible on the question of guilty knowledge; and it is said by Greenleaf that in cases of this kind proof of the prior or subsequent utterance of other false documents or notes, though of a different description, is admitted as material to the question of guilty knowledge or intent. 1 Greenleaf on Evidence, Section 53, and also note b; and Wharton's Criminal Evidence, Section 45; see also Commonwealth vs. Hall, 4 Allen, 305. In Regina vs. Forster, Dearsley's Crown Cases, 456, the decision of the Court of Criminal Appeal, on a question reserved, was that on an indictment for uttering counterfeit coin—a crown—in order to prove a guilty knowledge evidence may be given of a subsequent uttering by the prisoner of a counterfeit shilling, a coin of a different denomination to that mentioned in the indictment. The sub-

stance of the opinion is, that in order to show such guilty knowledge it would not be sufficient merely to prove some other dishonest act, but that in this case the uttering of the bad silver was so connected with the offense charged in the indictment as to make the evidence of it admissible, although the coin was of a different denomination; and that the difference in denomination went to the weight of the evidence but did not affect its admissibility. The only connection shown by the testimony was, that the defendant uttered the counterfeit piece, mentioned in the indictment, to Jane Needham on December 12, 1854, and the uttering of another counterfeit crown piece in the same city on the previous day was proved, and the uttering of the shilling was on January 4th following. In Commonwealth vs. Price, 10 Gray, 472, it was decided that under an indictment for having a $500 counterfeit bank bill of the Blackstone Bank, established at Boston, with intent to pass it, evidence that the defendant had in his possession counterfeit bank bills on banks in Rhode Island and New Hampshire, several days after passing the bill mentioned in the indictment, is admissible to show guilty knowledge or intent. See also State vs. Petty, Harper's Law Rep., 59; Commonwealth vs. Turner, 3 Met., 19, 24; Commonwealth vs. Stone, 4 Met., 43, 47; Commonwealth vs. Stearns, 10 Met., 256; Francis vs. State, 7 Texas Ct. App., 501; Lindsey vs. State, 38 Ohio St., 507; Commonwealth vs. Russell, 156 Mass., 196; Hennessy vs. State, 23 Texas Ct. App., 340; Smith vs. State, 29 Fla., 408, 421, 10 South. Rep., 894, 897; Bottomley vs. U. S., 1 Story, 135; Roscoe's Cr. Ev. (8th ed.), m. p. 95 *et seq.*; 2 Russell on Crimes, m. p. 836-842, and 594; Rice Cr. Ev., 779. The purpose of the admission of such evidence is to show the guilty knowledge of the accused; or, in other words, his

knowledge of the false character of the instrument described in the indictment; and also, the intent to defraud. In People vs. Everhardt, 104 N. Y., 591, where the uttering of other forged checks was held admissible, the observation of the Court of Appeals was: "Such proof is not received for the purpose of showing other crimes than that charged in the indictment, but for the purpose of showing the guilty knowledge and intent which are elements of the crime charged, and it can be considered by the jury only for that purpose. Although the evidence of Gaylord, corroborated as it was, as to the guilty knowledge of the defendant, was quite clear and convincing, yet the people were not bound to rest upon a *prima facie* case, but had the right to confirm that evidence by the proof as to the uttering of other forged checks." The doctrine of Commonwealth vs. Russell, 156 Mass., 196, is that in prosecutions for forgery and for uttering forged paper, proof is admissible, in order to show an intent to defraud by the forgery and also to show knowledge on the part of the accused with reference to the particular document which he is charged with uttering, that at or near the time of committing the alleged offense he had passed or had in his possession other similar forged documents. The authorities cited by counsel for plaintiff in error do not conflict with these views. State vs. Lapage, 57 N. H., 245; Commonwealth vs. Blair, 126 Mass., 40; Shaffner vs. Commonwealth, 72 Penn. St., 60; Wharton's Cr. Ev., section 48.

It is urged here that the several papers should not have been admitted in evidence because there is nothing that shows when they were negotiated or issued by the defendant. It is clearly shown that the paper of June 5th was uttered about July 19th, the time the

instrument declared on in the information was uttered; but it is not stated expressly by any witness when the paper of July 5th, or that of August 11th were uttered, or that the negotiation of the one of August 8th was fully consummated, although it is clear that it was in defendant's possession and had been the subject of negotiation and that it was a forgery at least as to Swaine. The real objection made to the admissibility of these papers was nothing more than that they were irrelevant and impertinent to the issue; their admissibility was for the court's decision. Can it be said that these papers, viewed in the light of the testimony relating to them, were irrelevant or impertinent to the issue involved? The purpose of their introduction, as limited by the judge in his instruction to the jury, was not to show that a forgery had been committed, nor even an intent to defraud, but that they should be considered by the jury only in determining whether, if the defendant negotiated the forged paper as good, he did so innocently or with a guilty knowledge of its falsity, and the jury were directed not to consider them for the former purposes.

The effect of the objection urged in the trial court was that the possession, use and uttering of these false instruments by the accused was no evidence of and did not tend to prove that the accused knew that the instrument declared upon in the information was false, and not genuine, when he uttered it; that such possession and uttering of the former or of any of them did not even to this extent touch upon the issue made by the pleadings so as to assist in getting at the truth of the charge made by the information. In view of the authorities, it is clear that the instruments and accompanying evidence were in their nature not irrelevant or impertinent; but, on the contrary, entirely the

reverse. Granting the proof of possession or uttering of other instruments at a time or times far away from that of uttering the instrument declared on may render the former inadmissible as irrelevant and impertinent, we do not think that such rule is applicable here. As stated above, the time of uttering the instrument of June 5th is expressly proved to have been almost contemporaneous with the negotiation of the main instrument, and as to the other papers the only natural inference that could be drawn from the testimony is that the transactions detailed as to them occurred near the time of the principal negotiation. The several instruments bear date near that time. There is nothing in the testimony that is consistent with a suggestion that any of the instruments may have been dated other than of the date they were uttered. The testimony as to their execution and use does not comport with any other idea than that their making and negotiation were connected acts. The statement of the defendant, including the date of the remarkable letter as indicated by the numbers at the foot of it, which, as is well known, mean August 13th, 1893, which was the day after the preparation of the guaranty to Mr. Blount, justifies the conclusion that the fatal exposure was made not later than the thirteenth day of August just named, and the only natural, reasonable and justifiable conclusion supported by the testimony is that the period of the lamentable transactions was not longer than from June 5th to August 12th, 1893. Any other conclusion is unnatural and contrary to the known modes of business conduct. It 'was not objected in the lower court that the collateral transactions were rendered inadmissible by an omission to prove the date of the same, but if it be that the objection made there is broad enough to cover the argument urged here,

our conclusion is that it is not supported by the record. There was no error in the ruling of the trial judge admitting the instruments referred to and the testimony of the several witnesses as to the same.

II. Another alleged error is the refusal of the court to charge the jury as follows: "Evidence of other forgeries that may be before you in this case should not be considered by you or given any weight whatever, unless there is evidence that satisfies you that at the time of the commission of the act charged in the information in this case the defendant had knowledge of the other forgeries testified about." The instruction was properly refused. It is not necessary, under any circumstances, to either the relevancy or weight of evidence as to other forged instruments that the accused shall be shown to have had knowledge of the false character of such instruments. His possession and use of such false instruments are admissible as evidence of his knowledge of the false character of the instrument declared upon.

III. The basis of another alleged error is the refusal of the judge to charge: "If you find that the defendant did commit the act with which he stands charged, you may consider his former life with reference to whether such a life would be one in which such an act would naturally or reasonably find place; and if you find that it would not, you may take that conclusion and use it in arriving at your verdict, and if it creates in your minds a reasonable doubt of defendant's guilt either as to the forgery or guilty knowledge in uttering it, you must acquit him of the charge with regard to which such doubt exists." The refusal was not error. In Hussey vs. State, 86 Ala., 34, the Supreme Court of Alabama, repeating what had been previously

declared by it, said that charges asserting that the jury may look to this fact, or may consider that fact, or are authorized to infer certain formulated conclusions from the evidence, and especially from certain specified parts of it, had often been condemned by that court, and should never be given, although either the giving or the refusal of such instructions may not be a reversible error; that they are legitimate arguments to the jury, and not announcements of legal principles proper to be in the form of instructions by the court. Snider vs. Burks, 84 Ala., 53. Again, not only is it not a charge upon the law of the case, but it announces an erroneous principle by telling the jury, in effect, that if they found that the former life of the accused was such that the act charged would not naturally and reasonably find place in it, they might permit such conclusion to raise a reasonable doubt of his guilt, although the evidence satisfied them that he had committed the act with which he was charged. Where the jury find from the evidence that a defendant has committed the criminal act charged, it is not consistent with their duty to permit a conclusion that the act committed was not naturally or reasonably in keeping with his former life to raise a doubt of guilt. If the jury do so there is no corrective agency, but the judges should not encourage them in any such divergence. The task of charging simply on the law at *nisi prius* is one of sufficient difficulty to relieve them from the new function, invoked here, of directing the mental processes of the jury. The judge had already, without exception thereto, charged the jury upon the subject of good character, telling them that they might consider the positive evidence of such character, and also the evidence that nothing injurious to the reputation of the accused had been heard against him, and

that such evidence should be considered by them in connection with all the other evidence in the case and their verdict rendered accordingly; and that if it raised a reasonable doubt of the guilt or innocence of the defendant he would be entitled to the benefit of that doubt, even though otherwise they had none, and to an acquittal. And further, that it devolved upon the State to prove its case beyond a reasonable doubt, such doubt being not a bare possibility of defendant's innocence, but a reasonably substantial doubt remaining in their minds after a full consideration of the evidence.

IV. Conceding to the testimony as to the previous excellent character of the defendant, the fullest weight that the most liberal authorities accord to such evidence, and recognizing both the disposition of the judge, that the defendant should have the benefit of any omission on his part to avail himself of an opportunity to escape after he became aware of the discovery of his offendings, and the marked fairness and clearness with which the case was submitted to the jury, all of which is shown by the rulings and instructions on the trial, we are satisfied that the verdict is fully supported by the evidence; but we do not find in the rulings and charges referred to, nor in the sentence pronounced, any ground for doubt by either the trial judge or ourselves, of the correctness of the verdict.

The judgment is affirmed.