ED. A. WALLACE, PLAINTIFF IN ERROR, VS. THE STATE
OF FLORIDA, DEFENDANT IN ERROR.

1. To sustain pleas of former conviction or former acquittal, it
must be shown that the offence of which such former convic-
tion or former acquittal was had, was the same as the one
charged in the indictment to which such pleas are interposed.

2. Where accused persons entered into one general conspiracy
to accuse various other persons of offences of keeping bawdy-
houses for the purpose of extorting money, and in pursuance
of the conspiracy did so accuse such other persons and extort
money from them, neither a conviction of such accused per-
sons upon a charge for the conspiracy, nor an acquittal upon
a charge of maliciously verbally threatening to accuse one of
their victims of the offence of keeping a bawdy-house for the
purpose of extorting money, constitute any defense to a charge
of maliciously verbally threatening to accuse another of their
victims of the offence of keeping a bawdy-house for the pur-
pose of extorting money, because the offences are entirely
separate and distinct.

3. Although the court may err in admitting evidence of acts of a
third person material to the issues, without proof that such
third person was acting under authority from the defendant,
yet if the defendant as a witness admits the authority of such
persons to do the acts, the error is cured.

4. Evidence of another and distinct crime committed by a defend-
ant, in no way connected by circumstances with the one for
which he is being tried, is inadmissible; but proof of any fact
with its circumstances, even though amounting to a distinct
crime, if it has some relevant bearing upon the issue being
tried, is admissible.

5. Evidence of defendant's acts prior or subsequent to the alleged
offence which logically tend to prove the criminal intent or
guilty knowledge where they are material is admissible, even
though such evidence tends to prove the commission of an-
other offence. Likewise, where the crime charged is one of
a system of criminal acts occurring so near together in point
of time and so nearly similar in means as to lead to the logical
inference that they are all mutually dependent and committed
in pursuance of the same deliberate criminal purpose and by

means planned beforehand, evidence of such other acts is admissible even though those acts amount to another criminal offence. But such evidence is not admissible for the purpose of proving that defendant committed the crime charged against him, but to show his purpose, plan, intent or knowledge, or to show that the acts charged against him were not the result of accident, mistake or inadvertence, or to rebut a defense which would otherwise be open to him.

6. Where a witness has testified to certain facts having no apparent tendency to criminate him, and a question is then asked, an affirmative answer to which, taken in connection with the other facts testified to, would furnish pertinent evidence against the witness upon a criminal prosecution against him, the court may properly permit the witness to avail himself of his privilege of not answering, without requiring him to say in so many words that the answer would tend to criminate him, or to explain how it would tend to do so.

7. Although the court for an erroneous reason declines to require a witness to answer a question propounded by counsel, yet where it clearly appears to the appellate court that the answer to such question would have been wholly irrelevant and immaterial, the ruling will not be disturbed.

8. It is a matter of discretion with the trial court to permit or to decline to permit a witness upon cross-examination to be interrogated as to indictments or charges before conviction, against him, of criminal offences, and this discretion is not subject to review on appeal or writ of error unless abused.

9. Where the court erroneously admits evidence of an isolated, immaterial fact, but it affirmatively appears to the appellate court that such evidence did not injure the defendant, and that the immaterial fact, standing alone or in combination with the other evidence in the case, could not have injured him, such error will be deemed harmless, and insufficient to reverse the judgment.

10. Where the court permits a witness to testify to a pertinent matter of which the court is required to take judicial knowledge, and the answer of the witness truly states the matter as it should lie within the judicial knowledge of the court, the party objecting to such evidence is not injured by its admission.

11. A plaintiff in error is in the appellate court confined to the

Wallace v. State.—Syllabus.

specific grounds of objection made by him to questions propounded to witnesses in the trial court, and objections to such questions raised primarily in the appellate court will not be considered.

12. Since the act of 1895, Chapter 4400, when an accused person elects to avail himself of its provisions he occupies the status of a witness, becomes liable to cross-examination the same as other witnesses, and what he states is subject to the tests established for weighing the testimony of other witnesses.

13. The cross-examination of all witnesses is confined to the facts and circumstances connected with the matters stated in direct examination, but when a witness testifies to certain facts relating to a transaction in his presence, he may on cross-examination be required to testify to the whole of it. He may likewise be required to answer any proper question tending to discredit him, and he may be interrogated concerning matters which, if true, are inconsistent with his direct testimony or which render his statements on direct examination improbable.

14. For the purpose of discrediting a witness a wide range of cross-examination is permitted as a matter of right, in regard to his motives, interest or animus as connected with the cause or the parties thereto, upon which matters he may be contradicted by other evidence, and a like range of cross-examination is, in the discretion of the trial court, allowed into the past life and history of a witness and as to his present employments and associates, when the matters inquired about tend to affect credibility, and while answers to questions of this nature are conclusive upon the party asking them, and may be wholly irrelevant as to the direct question of defendant's guilt, and may tend to degrade or disgrace the witness, they are not for these reasons only to be disallowed; but if answers to questions of this nature would tend to criminate the witness and he claims his privilege of declining to answer, he should not be compelled to answer. The matter of permitting questions of this nature rests in the sound judicial discretion of the trial court who must judge of their propriety from what transpires upon the trial and the course and conduct of the witness upon the stand, and this discretion will not be interferred with by an appellate court unless abused. These rules apply to the cross-examination of a defendant, when he

voluntarily offers himself as a witness, to the same extent and with like limitations as to other witnesses.

15. The rules which should govern the trial court in exercising its discretion in allowing or disallowing inquiries upon cross-examination into collateral matters to affect credibility do not authorize any question to be put for the sole purpose of disgracing a witness. The court should disallow all inquiries into collateral matters which do *not tend to affect credibility.* The inquiry must, in general, though not necessarily always, relate to transactions comparatively recent, and the transaction inquired about must be one which bears directly upon the present character or credit of the witness. Inquiry into collateral matters should not be permitted unless there is reason to believe it may tend to promote the ends of justice and it seems essential to the true estimation of the witness' testimony by the jury. The court should promptly suppress all inquiry into matters not relevant to credit, and should not permit a disparaging course of examination which seems unjust to the witness, and uncalled for by the circumstances of the case.

16. Where proper questions are asked, but objectionable answers are given, the party complaining should move to strike the answers.

17. The court does not err in refusing instructions the substance of which has already been given in the general charge of the court.

18. The court does not err in refusing instructions not based upon any evidence in the case, or which assume as proven facts matters not admitted by the parties and as to which the evidence is conflicting.

19. The court does not err in refusing instructions so framed as to mislead the jury into erroneous impressions of their duty in passing upon the guilt or innocence of the defendant.

20. An instruction to the jury that defendant is presumed by the law to be innocent, that the burden is upon the State to establish his guilt beyond a reasonable doubt, that "a reasonable doubt is a doubt for which you can give a reason. In other words, if the evidence of defendant's guilt satisfies you to such an extent as to leave you without a doubt that he may be innocent, for which you can give an intelligent reason, then it would be your duty to convict. Such a doubt may arise either

Wallace v. State.—Syllabus.

from affirmative evidence tending to show the defendant's in-nocence, or from the lack of evidence sufficient to establish his guilt," may properly be given.

21. Under the discretion vested in judges in this State as to the duration of terms of imprisonment to be fixed by them upon convictions for felonies, and in accordance with common law principles and the manifest intention of our criminal laws to punish separately each offence committed against them, this court holds that in all criminal convictions where the sentence is to a term of imprisonment the court can in its discretion fix the term so that it will begin at the expiration of a former sentence.

22. A sentence should be definite and certain so as to advise the defendant and the officer charged with its execution of the time of its commencement and termination, without being re-quired to inspect the records of another court, or the record of another case.

23. Where by the terms of a sentence to a term of imprisonment it is made to begin "at the expiration of first sentence," and there is nothing in the record or in the language of the sen-tence to show for what offence or in what court such "first sentence" was imposed, or when it began, or where it was to be executed, or for what period of time it was imposed, such sentence is erroneous, because vague and indefinite.

24. Where an appellate court finds no reversible error in a record except that the sentence imposed is too vague and indefinite, it will not direct a new trial, but will reverse the judgment and remand the cause for the imposition of a proper sentence.

25. Evidence examined, and found sufficient to support the ver-dict.

Writ of error to the Circuit Court for Escambia coun-ty.

The facts in the case are stated in the opinion of the court.

*Liddon & Eagan*, for Plaintiff in Error.

*The Attorney General*, for Defendant in Error.

CARTER, J.:

On January 24, 1898, the County Solicitor for Escambia county filed in the Criminal Court of Record of that county an information charging that Pat McHugh, as mayor of the city of Pensacola, and Ed. A. Wallace, as marshal of said city, on the 8th day of August, 1897, did verbally threaten to accuse Marie Anderson of an offence against the code of ordinances of the city of Pensacola, and did then and there, with the intent to extort money from the said Marie Anderson, maliciously verbally threaten to accuse said Marie Anderson of the offence of keeping a bawdy-house against the ordinances aforesaid, and to have her arrested for same if she did not pay to them, or either of them, the sum of fifty dollars, and that in the manner and form as aforesaid, by the means aforesaid, he the said Pat McHugh, and he the said Ed. A. Wallace, did then and there maliciously threaten to accuse the said Marie Anderson of said offence with intent thereby to extort money from her, the said Marie Anderson, against the form, &c. Wallace moved to quash the information upon the ground that it was vague, indefinite, uncertain and charged no offence. This motion was overruled, and thereupon defendant was arraigned and pleaded specially, first, a former conviction and sentence upon an information in the same court charging by the first count that Pat McHugh and Ed. A Wallace on August 7, 1897, did unlawfully and maliciously agree, conspire, confederate and combine to extort, obtain and procure of and from Melissa Zurich payment by her of a large sum of money, and in order to extort, obtain and procure the payment by her of the sum of one hundred dollars, did corruptly and unlawfully conspire to verbally threaten to have the

said Melissa Zurich arrested for being the keeper of a
bawdy-house; and by the second count, that on August
7, 1897, Pat McHugh, mayor of the city of Pensacola,
and Ed. A. Wallace, marshal of said city, on said day,
unlawfully intending to extort, obtain and procure
money from one Melissa Zurich, did unlawfully and
maliciously conspire, confederate, combine and agree
together to presume to act officially in their respective
offices, and under color of their respective offices as
aforesaid, to threaten and oppress the said Melissa Zu-
rich in order by said oppression of said Melissa Zurich
to obtain, procure and extort of and from her the pay-
ment to them of a certain sum of money, to-wit: one
hundred dollars; the plea alleging that the conspiracy
against Melissa Zurich in said information named was
only part and parcel of one general conspiracy alleged
and proved upon the trial to have been entered into by
this defendant and his codefendant Pat McHugh against
a large number of persons to maliciously accuse them
and have them arrested for being keepers of bawdy-
houses, or keepers of gambling houses, in order to ex-
tort money from them; the said Melissa Zurich and one
Mary Richardson and said Marie Anderson being in-
cluded in those against whom the conspiracy was made,
and that the matters alleged in the informations were
parts and parcels of one transaction and one offence;
and second, a former acquittal upon an information in
the same court charging that Pat McHugh, as mayor
of the city of Pensacola, and Ed. A. Wallace, as marshal
of said city, on August 8, 1897, did verbally threaten to
accuse Mary Richardson of an offence against the code
of ordinances of the city of Pensacola, and did then and
there as aforesaid, with the intent to extort money from
said Mary Richardson, maliciously verbally threaten to

accuse said Mary Richardson of the offence of keeping a bawdy-house against the ordinances aforesaid, and to have her arrested for same if she did not pay to them or either of them the sum of twenty-five dollars, and in the manner and form aforesaid, by the means aforesaid, he the said Pat McHugh and he the said Ed. A. Wallace did then and there maliciously threaten to accuse the said Mary Richardson of said offence with intent thereby to extort money from her the said Mary Richardson, and alleged that the malicious verbal threats charged in said information, and in the one to which this plea was pleaded, and the conspiracy charged in the information mentioned in the first plea, were all parts and parcels of one transaction and constituted but one and the same offence. The court sustained the State's demurrer to these pleas, and thereupon defendant pleaded not guilty, upon which a trial was had resulting in a verdict of guilty. Defendant's motion for a new trial being overruled, the court pronounced sentence that defendant "be confined in the State penitentiary at hard labor for a period of five years, sentence to begin at the expiration of first sentence. It is therefore considered and adjudged by the court that the said Ed. A. Wallace at the expiration of his first sentence be taken by the sheriff of this county and by him delivered or caused to be delivered to the keeper of said penitentiary, to be by him confined in the aforesaid penitentiary for the aforesaid period of five years." From the sentence imposed this writ of error is taken.

I. The first error assigned relates to the ruling refusing the motion to quash. The contention is that the information alleges legal conclusions only, the words used in making the threat being omitted, and that the information fails to charge that the threats were made

maliciously. We shall not examine the information further than to ascertain whether it is amenable to the specific objections urged; and, if so, whether it ought to be quashed therefor. The statutes (§2420, Rev..Stats.,) provides that "whoever, either verbally or by a written or printed communication maliciously threatens to accuse another of any crime or offence * * * with intent thereby to extort money * * * shall be punished by imprisonment in the State prison not exceeding ten years." While there are some superfluous allegations in the information, it does charge that defendants did maliciously verbally threaten to accuse Marie Anderson of the offence of keeping a bawdy-house against the ordinances of the city of Pensacola, with intent to extort money from her, and the defendant's conduct is distinctly alleged to have been malicious. It was unnecessary to give the language of the threats used. The substance only of the threats need be set forth in an information under this statute; the particular language used is a matter of proof. The allegations that the defendants maliciously verbally threatened to accuse Marie Anderson of the specific offence named, state the substance of the threats, and are sufficient without quoting the language of the parties. Commonwealth v. Moulton, 108 Mass. 307; State v. Lewis, 96 Iowa, 286, 65 N. W. Rep. 295; 2 Bishop's Crim. Proc. §1026; Bishop's Directions & Forms, §979.

II. The State's demurrer to defendant's special pleas was properly sustained, because neither the former conviction nor the former acquittal was for the same offence as that charged in the information in this case, and to sustain pleas of this character the offences must be the same. Newberry v. State, 26 Fla. 334, 8 South. Rep. 445; Tuberson v. State, 26 Fla. 472, 7 South. Rep. 858;

Boswell v. State, 20 Fla. 869. The first count of the information mentioned in the first plea charged McHugh and Wallace with a criminal conspiracy to extort money from Melissa Zurich by verbally threatening to charge her with being the keeper of a bawdy-house, and the second count charged the same parties as officials of the city of Pensacola, with criminal conspiracy in their official capacity and under color of their offices to threaten and oppress Melissa Zurich in order to extort money from her. The information mentioned in the second plea charged the same parties with maliciously verbally threatening to accuse Mary Richardson of the offence of keeping a bawdy-house, with intent to extort money from her. It is obvious upon the face of these informations the charge in each case was of an offence other than and different from the one for which defendant was being tried, viz: maliciously verbally threatening to accuse *Marie Anderson* of the offence of keeping a bawdy-house with intent to extort money from her. The pleas alleged, however, that the conspiracy against Melissa Zurich was only part and parcel of one general conspiracy on the part of McHugh and Wallace against a large number of persons to maliciously accuse them of being keepers of bawdy-houses and gambling houses, in order to extort money, Melissa Zurich, Mary Richardson and Marie Anderson being included in those against whom the conspiracy was made, and that said conspiracy, and the threats against Mary Richardson and Marie Anderson were parts and parcels of one transaction and constituted but one and the same offence. If the information mentioned in the second plea, or the one upon which defendant was being tried, had been for conspiracy to do the acts charged to have been done in each, the defendant's contention that the acts charged

were but parts of the same transaction or conspiracy charged in the information mentioned in the first plea would be more plausible; but such is not the case. In order to convict of the conspiracy, the consummation of its object need not be proved, although evidence thereof would not be immaterial on the question of intent. To convict either defendant upon the information mentioned in the second plea, or upon the one under which defendant was tried it would not be necessary, though it might be proper, to prove a conspiracy, but it would be necessary to prove that defendants maliciously verbally threatened, &c. The conspiracy was a mere misdemeanor, but the accomplishment of its object would have constituted a felony. It may be that when the object of the conspiracy was accomplished, the misdemeanor would be merged in the felony, and if this be true, the defendant ought to have been acquitted of the conspiracy, but having suffered a conviction upon the charge of conspiracy, he can not be heard to plead it in bar of the felony committed in pursuance of the conspiracy. The most favorable view that can be taken of the allegations of the pleas is that defendants entered into one general conspiracy to accuse different persons of offences of keeping bawdy-houses or gambling houses for the purpose of extorting money, and that in pursuance of this conspiracy various persons were so accused, and money extorted from them. While the conspiracy may have been one single, indivisible transaction, yet the accomplishment of its object involved distinct acts against different individuals, although the acts against each were of precisely the same nature. If they, in pursuance of the conspiracy, threatened to accuse Melissa Zurich with being the keeper of a bawdy-house, with intent to extort, &c., they committed one felony; and

if they, in pursuance of the conspiracy, threatened to accuse Mary Richardson with being the keeper, &c., they committed another, distinct felony by other though similar means; and if they threatened to accuse Marie Anderson with being the keeper, &c., they committed another distinct felony by other, though similar means. Though the means were similar, they were not identical, for they related to and affected different persons, with a different object, in the one case the threats were to Melissa Zurich to induce her to pay money, in another to Mary Richardson to induce her to pay money and in the other to Marie Anderson to induce her to pay money. While the conspiracy may have been single, and therefore subject to one indictment only, yet the felonies accomplished by means of the conspiracy were separate and distinct, depending upon different acts, provable by different evidence, and accomplished by distinct though similar means. The evidence essentially necessary to sustain one indictment would not sustain either of the others; nor could defendant be convicted upon one information upon the evidence necessary to sustain either of the others. While evidence of threats to accuse Melissa Zurich and Mary Richardson of offences of keeping bawdy-houses, as we show further on, was admissible upon the trial for threats to accuse Marie Anderson of keeping a bawdy-house with intent, &c., such evidence alone would not sustain a conviction under the latter charge, because it would be necessary to prove that Marie Anderson was threatened; an act and a crime separate and distinct from the one accomplished by threats to Melissa Zurich or Mary Richardson. 1 Bishop's Crim. Law, §1065; Ibid. §§1052, 1061; State v Sias, 17 N. H. 558; State v. Horneman, 16 Kan. 452.

III. Marie Anderson, a witness for the State, testi-
fied that she resided in Pensacola in August, 1897;
that on August 7, Regan, a policeman of the city, noti-
fied her to be at the police station on the next day (Sun-
day) between 2 and 3 o'clock; that she complied with
the notice and found McHugh, mayor, and Wallace,
marshal, in their private room; that the door was closed
and Regan was standing at it; that she went in, found no
one there but McHugh and Wallace and at the interview
then had between them the State claimed that the al-
leged threats were made. Rosa Johnson, another State
witness, testified that she also was notified by Regan
on August 7, to appear at the police station next day;
that she did so, found McHugh and Wallace in the
mayor's office, and had an interview with them in which,
according to the State's contention, she was threat-
ened with a criminal accusation in order to extort
money. The defendant objected to the testimony of
these witnesses as to their being notified by Regan to
appear at the police station, upon the ground that same
was irrelevant, immaterial and hearsay, and it is insisted
that the decision overruling these objections was erro-
neous. The testimony was obviously relevant if Regan
was acting under authority from defendant and Mc-
Hugh. In his testimony defendant admitted that Re-
gan had authority from him and McHugh to notify par-
ties to appear at the police station, and that he and
McHugh were at the latter's private office on August
8, 1897, and received "these people," referring to the
State's witnesses, one at a time. It is true he did not
remember seeing Marie Anderson there, and he claimed
that all the parties present that day were being tried
by the mayor for the offences of keeping or visiting
bawdy-houses or gambling houses, but his admission

that Regan had authority from him and McHugh to notify persons to appear before them rendered the evidence objected to relevant and competent, and the error, if any, in admitting it originally was cured by defendant's own admissions in the case.

IV. Marie Anderson testified that upon her appearance at the police station on Sunday, August 8th, she was admitted into the private office of the mayor, where she found McHugh and Wallace alone; that McHugh asked her name and Wallace told him it was Marie Anderson, and that she kept a large house with eight or ten girls; that she replied that she did not keep a large house, that there were only two girls at her house; that Wallace said she kept eight or ten girls; that he wanted fifty dollars, and that she must pay it next morning or go to jail; that she had not been served with a warrant, was not asked to plead guilty to any offence, no witnesses were examined against her, nor was she asked if she desired any witnesses to swear for her; that she paid Wallace twenty-five dollars next morning between nine and ten o'clock; that she subsequently paid the balance partly to McHugh and partly to Wallace and that part of it was paid after Wallace came to her house and asked if she had any money, and told her if she did not pay "that fine" she "would have the yellow fever." She also stated that on the Sunday in question she saw all of the State's witnesses at the police station. The State thereupon introduced various other witnesses who testified that they were on August 7, 1897, notified by Regan to appear at the police station on the next day; that they did so and found McHugh and Wallace in a private office; that they were separately admitted into this room and demands were made upon them by McHugh and Wallace for sums of money; that

Wallace v. State.—Opinion of Court.

they either at that time or subsequently complied with
such demands by paying money to Wallace and Mc-
Hugh; that no court was being held on that day, no
witnesses examined, no arrests had been made and no
charges in regular form for offences against the city
ordinances had been preferred, and that the clerk of
the police court was not present at the time. The testi-
mony of some of these witnesses, Rosa Johnson, Jim
Goldstucker and Tom Ridley tended to show that the
money demands were made upon them either under
insinuations of prosecution, or under the guise of fines
imposed, for keeping bawdy-houses or visiting gam-
bling houses; others, Nellie Payne, Cora Pearl, Pauline
Spencer, Melissa Zurich, Mabel Spencer, Charles Evans
and Major Cowart, that demands were made upon them
for money under various pretexts, such as "you have
had fun enough to pay fifty dollars," or "we want fifty
dollars for protection; this is a better way than to both-
er you," or "we suppose you know what you are here
for, is fifty dollars too much?" or by simply demanding
money without explanation, or pretending to impose
it by way of a fine without a trial. The State also in-
troduced evidence tending to show that Mollie McCoy
was notified by Regan to appear at the police station
on August 8, but she did not go; that when Cora Pearl
was before Wallace and McHugh on that day they
asked her where Mollie McCoy was, and being told she
was at home they told Cora Pearl to tell her they would
be around for seventy-five dollars; that on a subsequent
evening after dark McHugh and Wallace called at Mol-
lie McCoy's house and collected the seventy-five dol-
lars, although she had not been arrested for any offence
or tried by the mayor upon any charge, and she told
them she was not paying the money as a fine. The

36

testimony of each witness was objected to as being immaterial and irrelevant, and the argument in this court is that the evidence of these witnesses proved distinct offences, and that it was not proper to show that Wallace and McHugh had threatened other people in a manner similar to that charged in the information upon which he was being tried. The rule of law applicable to this question may be stated as follows: Evidence of another and distinct crime, committed by a defendant, in no way connected by circumstances with the one for which he is being tried, is inadmissible; but proof of any fact with its circumstances, even though amounting to a distinct crime, if it has some relevant bearing upon the issue being tried, is admissible. Roberson v. State, 40 Fla. 509, 24 South. Rep. 474. In that case we held that evidence tending to prove that defendant intentionally set fire to and burned a house which he was charged with breaking and entering in order to conceal or destroy the physical evidence of the breaking was competent. All the authorities concur in the view that evidence of defendant's acts prior or subsequent to the alleged offence which logically tend to prove the criminal intent, or guilty knowledge, where they are material, is admissible; and likewise where the crime in question is one of a system of criminal acts occurring so near together in point of time and so nearly similar in means as to lead to the logical inference that they are all mutually dependent and committed in pursuance of the same deliberate criminal purpose and by means planned beforehand, evidence of such other acts is admissible, even though those acts amount to another criminal offence. But such evidence is not admissible for the purpose of proving that defendant committed the crime charged against him, but to show his

purpose, plan, intent or knowledge, or to show that the acts charged against him were not the result of accident, mistake or inadvertence, or to rebut a defence which would otherwise be open to the accused. For leading cases upon this subject, see State v. Lapage, 57 N. H. 245, S. C. 24 Am. Rep. 69, referred to approvingly in Mann v. State, 22 Fla. 600; Trogdon v. Commonwealth, 31 Gratt. 862; State v. Myers, 82 Mo. 558, S. C. 52 Am. Rep. 389. See, also, Langford v. State, 33 Fla. 233, 14 South. Rep. 815; Queen v. Francis, L. R. 2 Cr. Cas. Res. 128; Makin v. Attorney-General, L. R. App. Cas. (1894), 57; State v. Fallon, 2 N. Dak. 510, 52 N. W. Rep. 318; Rafferty v. State, 91 Tenn. 655, 16 S. W. Rep. 728; State v. Turley, 142 Mo. 403, 44 S. W. Rep. 267; State v. Wilson, 143 Mo. 334, 44 S. W. Rep. 722; Leeper v. State, 29 Tex. App. 63, 14 S. W. Rep. 398; Crum v. State, 148 Ind. 401, 47 N. E. Rep. 833; Housh v. People, 24 Col. 262, 50 Pac. Rep. 1036; People v. Williams, 58 Hun, 278, 12 N. Y. S. 249; Card v. State, 109 Ind. 415, 9 N. E. Rep. 591. We are of the opinion that the evidence objected to came within the rule above stated and that it was properly admitted. State v. Lewis, 96 Iowa, 286, 65 N. W. Rep. 295; State v. Balch, 136 Mo. 103, 37 S. W. Rep. 808.

V. Rosa Johnson, one of the State's witnesses, had testified on direct and cross-examination that she was on August 8, 1897, residing at 40 E. Saragossa street; that when she appeared before McHugh and Wallace on that day Wallace asked her if she rented a house, and when she said yes, he said he wanted twenty-five dollars; that McHugh and Wallace asked her if she rented a house and fined her for renting a house, although she knew it was not against the law to rent a house. The

defendant then asked her on cross-examination: "Was that house a house of prostitution?" The witness stated "I decline to answer." The defendant then asked: "Will you state your reason why you decline to answer?" The witness replied: "I refuse to answer that also." When the questions were asked, the witness was instructed that she need not answer them if she thought the answers might incriminate her or cause her to be prosecuted for any criminal offence. The defendant did not press the questions further other than to insist that the witness be required to state her reason for declining to answer, but the court held that she need assign no reason. The witness further stated on cross-examination: "When I was arrested a friend paid my fine." Defendant then asked her: "What is the name of your friend?" The witness replied "I decline to answer." Defendant insisted that the witness be required to answer the question, but the court ruled that she need not answer if she thought it would tend to criminate her, and defendant excepted to the ruling.

1. The ruling upon the questions first proposed was correct. An affirmative answer to the question: "was that house a house of prostitution?" taken in connection with previous admissions that she had rented it and resided there, would have furnished pertinent evidence against her upon a prosecution for keeping a house of ill fame. There was sufficient before the court for the latter to see that the answer would tend to criminate the witness, and to permit her to avail herself of the privilege without requiring her to say in so many words that it would tend to criminate her, or to explain how it would tend to do so. The rule stated in *Ex parte* Ed. Senior, Jr., 37 Fla. 1, 19 South. Rep. 652, is that while the witness must judge of the effect of his answer and

should not be required to explain how it will criminate him, yet the court must determine under all the circumstances of the case whether such will be its tendency from the question asked, and where from the nature of the investigation and the character of the testimony sought, it reasonably appears that the answer may criminate, or tend to criminate, the witness has the right to claim his privilege and is not bound to answer, and the court was governed by that rule in this case.

2. We fail to see what relevancy or bearing an answer to the question, "what is the name of your friend," could have had upon the issues being tried. It was wholly immaterial what friend of the witness had paid a fine for her when she was under arrest. In fact there was no evidence that this witness was ever arrested except as implied in her statement on cross-examination, "when I was arrested a friend paid my fine." No other allusion to any arrest occurs in her testimony, and the fine here mentioned by her evidently refers to some fine other than the one which defendant claims was imposed upon her on August 8, 1897, for she states that she paid that sum herself at various times without ever having been under arrest. Even if the court declined to require the witness to answer the question for an erroneous reason, the ruling should not be disturbed where it clearly appears that the answer would have been wholly irrelevant and immaterial.

VI. On cross-examination defendant propounded to J. E. Lawless, a State's witness, the following question: "Are there any criminal charges pending against you?" which the court excluded upon objections by the State, but the grounds of objection are not stated. There is some conflict of authority as to the propriety of questions of this nature on cross-examination. All

seem to hold that if a question of this character is answered by the witness, his answer can not be contradicted by other evidence. Some hold that an accusation merely, furnishes no proof of guilt, and can not, therefore, logically affect the credibility of the witness, wherefore questions respecting mere accusations are properly excluded. People v. Crapo, 76 N. Y, 288, 32 Am. Rep. 302; Ryan v. People, 79 N. Y. 593; Van Bokkelen v. Berdell, 130 N. Y. 141, 29 N. E. Rep. 254; People v. Hamblin, 68 Cal. 101, 8 Pac. Rep. 687; State v. Millmeier, 102 Iowa, 692, 72 N. W. Rep. 275; Bates v. State, 60 Ark. 450, 30 S. W. Rep. 890; Roop v. State, 58 N. J. L. 479, 34 Atl. Rep. 749; State v. Kent, 5 N. Dak. 516, text 557, 67 N. W. Rep. 1052. In Missouri the exclusion of such questions is reversible error (State v. Taylor, 118 Mo. 153, 24 S. W. Rep. 449), although the court had previously held otherwise (State v. Howard, 102 Mo. 142, 14 S. W. Rep. 937); and in Texas the rule seems to be that on cross-examination a witness may be interrogated as to indictments or accusations against him for crimes involving moral turpitude, but no others (Brittain v. State, 36 Tex. Cr. Rep. 406, 37 S. W. Rep. 758; Goode v. State, 32 Tex. Cr. Rep. 505, 24 S. W. Rep. 102), but the general rule upon this subject, sustained by the weight of authority, is that cross-examination of a witness as to indictments or charges before conviction against him, of criminal offences, is a matter of discretion in the trial court, not subject to review on writ of error or appeal, unless the discretion is abused. Wroe v. State, 20 Ohio St. 460; Hanoff v. State, 37 Ohio St. 178, S. C. 41 Am. Rep. 496; State v. Murphy, 45 La. Ann. 958, 13 South. Rep. 229; Driscoll v. People, 47 Mich. 413, 11 N. W. Rep. 221; State v. Pfefferle, 36 Kan. 90, 12 Pac. Rep. 406; State v.

Bacon, 13 Oregon, 143, 9 Pac. Rep. 393; Hill v. State, 42 Neb. 503, 60 N. W. Rep. 916; People v. Hite, 8 Utah, 461, 33 Pac. Rep. 254; Penny v. Rochester Ry. Co., 7 Hun, App. Div. 595, affirmed 154 N. Y. 770, 49 N. E. Rep. 1101; 1 Thompson on Trials, §464. There is nothing in this case to show an abuse of discretion by the ruling complained of, nor does the plaintiff in error contend that the court below abused its discretion in the matter. For the rules which should govern the exercise of the court's discretion in allowing or disallowing questions of this nature upon collateral matters to affect the credibility of a witness see paragraph X of this opinion.

VII. Felix Glackmeyer, a State witness, testified that in August, 1897, he was city clerk of the city of Pensacola, and held such office at the time of the trial. He produced a document and testified that it was the police court docket. A portion of this docket including cases from August 7th, to 14th, 1897, was then offered in evidence, and it fails to show that any proceedings were had in the police court on August 8, 1897, or entries made thereon as of that date. The defendant thereupon propounded to the witness the following question: "Do you know whether or not fictitious names are put on that docket, whether parties would just pay their fine and not go to court? You know whether or not fictitious names are frequently entered on the docket where parties did not appear in the court, but paid the fine for the offence charged?" These questions were excluded on objections by the State, and we think correctly so, because they were not properly in cross, and were not framed to impeach that part of the docket offered in evidence by showing a practice

during the period covered thereby of putting fictitious names thereon.

VIII. W. H. H. McDavid testified on behalf of the State "I know Rosa Johnson. She was arrested a good many times. I do not remember any particular charge. She paid me ten dollars in November which I gave to Wallace." Defendant objected to this evidence as irrelevant and immaterial, but the court overruled the objections. Rosa Johnson was a State witness, and it is not easy to see what object the State's counsel had in offering evidence tending to discredit her by showing that she had been arrested a good many times. The first part of McDavid's testimony was clearly beneficial to the defendant, and he has assigned no error on it in this court. He does insist, however, that the court erred in overruling his objections to the statement that "she paid me ten dollars in November, which I gave Wallace." There is no doubt that this statement of the witness was irrelevant and immaterial. The State did not attempt to show that this ten dollars was paid in pursuance of the demand made upon her by Wallace and McHugh on August 8th, or in pursuance of a demand made upon her by either of them at any other time. While the court should have excluded it, we are clearly of the opinion that it did not and could not injure the defendant. It was an isolated immaterial fact, harmless in itself and one from which no prejudicial inferences could have been drawn by the jury. No effort was made to show that Wallace received this money in his official capacity, or that he failed to properly account for it, or that it was even paid to him as a fine or money due the city. The statement did not tend to corroborate anything in the testimony of Rosa Johnson or any other witness. Standing alone, or in combina-

tion with other evidence it was harmless; for alone, it suggested no improper conduct on defendant's part, and in connection with other evidence, it had no tendency to add credit to such other evidence or to extend its criminating force. While the court erred in admitting it, the error was harmless.

IX. The defendant was sworn as a witness and testified that in August, 1897, he was marshal and McHugh mayor of Pensacola; that he had heard the testimony of Melissa Zurich, Nellie Payne, Mollie McCoy, Pauline Spencer and Mabel Spencer; that of his own knowledge they were keepers of bawdy-houses; that he knew Major Cowart, Charles Evans and Jim Goldstucker who he said were gamblers; that these parties were summoned to appear before the mayor on Sunday; that this was done under the direction of the mayor as he thought it better than to make wholesale arrests; that he and McHugh chose this method because the latter said it was a better way to suppress crime and had been debated in council; that they selected an officer to summon the parties to appear; that nothing was said to these people about wanting money; that those who pleaded guilty to visiting bawdy-houses were required to pay fines; that there were no threats made about prosecution; that he did not know the parties were to appear at the police station on Sunday until the mayor told him to be there at a certain hour; that Melissa Zurich requested her name to be put down as Melissa Zack. The State had introduced evidence tending to show that there was another docket from which the mayor's docket was copied as cases were disposed of by the police court, known as the turnkey's docket; that sometime after the 8th of August, 1897, Rev. Mr. McNeil preached a sermon on reform of government, mak-

ing reference to the holding of a "Sunday court;" that Wallace knew the subject-matter of this sermon as it was published in the newspapers and discussed by some of the city officials in his presence; that the turnkey's docket disappeared shortly after this sermon was preached and that it disappeared with the connivance or by the direct action of Wallace and McHugh. Upon this subject Wallace testified that he had heard the testimony of Cummings about a docket being missing; that he and McHugh were present that night and he knew the next morning that the docket had been stolen, but that he did not steal it, nor did McHugh to his knowledge; that he was not present when Mc-Neil preached the sermon—did not hear it, but did read it, and that there was nothing in it to hurt him.

(1) On cross-examination he stated that he and Mc-Hugh were in the mayor's private office on Sunday, August 8, and received these people in the private room one at a time; that he remembered Melissa Zurich, she was there. The State then asked the witness "how much she was asked for?" to which defendant object-ed, because it was not in cross, was immaterial and irrele-vant, and assumed facts not admitted by defendant to have been proven. These objections were properly overruled. The defendant had testified on direct ex-amination that Melissa Zurich was there; that some of the parties pleaded guilty and were required to pay fines for visiting bawdy-houses; that Melissa Zurich requested her name to be put down as Melissa Zack. The question was therefore strictly in cross; the answer would be material and relevant upon the question of defendant's knowledge and intent, and the question did not assume any fact to be true which defendant had denied or produced any proof to disprove. Melissa

Zurich had testified that McHugh and Wallace on that occasion demanded money from her and defendant had not denied it. On the contrary his testimony tended to sustain his theory that she pleaded guilty to visiting a bawdy-house, and was fined therefor under an assumed name. The question objected to was framed so as to ascertain the amount of such fine.

(2) Another question propounded to defendant on cross-examination was: "whose duty is it to collect the fines imposed by the mayor?" Several objections were urged, but only one is here argued. It is said that the question called for defendant's legal opinion; that the ordinances of the city of Pensacola made it the duty of the marshal to collect all fines imposed, and that under Section 11, Chapter 4513, acts 1895, the courts are required to take judicial notice of all ordinances of said city. The answer of the witness was that he sometimes collected the fines, and sometimes sent a policeman for them. He did not literally answer the question as to whose duty it was to collect them, but stated who actually collected them, thereby recognizing it to be his duty as marshal. His answer being therefore the same in substance as the city ordinance of which the court was required to take judicial notice, we fail to see how he has been harmed. McCallum v. Driggs, 35 Fla. 277, 17 South. Rep. 407; Roof v. Chattanooga Wood Split Pulley Co., 36 Fla. 284, 18 South. Rep. 597.

(3) Assignment of error No. 27 complains that the court required defendant to testify that he collected money from Mollie McCoy and saw her at her house, and assignments Nos. 28 to 33 inclusive complain that the court required him to testify as to fines imposed upon Rosa Johnson, Nellie Payne, Pauline Spencer, Mabel Spencer, Jim Goldstucker and Mary Richardson,

and as to his collecting money from them. All of this testimony except that relating to Mary Richardson was objected to as not being in cross, and as being irrelevant and immaterial. No grounds of objection were stated in the objections to the testimony relating to Mary Richardson and we need not further consider the assignment of error based thereon. It is argued under these assignments that defendant was forced to give testimony relating to other offences that might subject him to criminal prosecution, but no objection was interposed upon that ground, nor did defendant claim any supposed privilege of not answering on the ground of self crimination. We can not, therefore, consider that objection as it is presented for the first time in this court. Camp v. Hall, 39 Fla. 535, 22 South. Rep. 792. Since the act of 1895, Chapter 4400, when an accused person elects to avail himself of its provisions he occupies the status of a witness, becomes liable to cross-examination as other witnesses, and what he states is subject to the tests established for weighing the testimony of other witnesses. Hart v. State, 38 Fla. 39, 20 South. Rep. 805. The cross-examination of all witnesses is, however, confined to the facts and circumstances connected with the matters stated in the direct examination, but when a witness testifies to certain facts relating to a transaction in his presence, he may on cross-examination be required to testify to the whole of it. Savage v. State, 18 Fla. 909; Adams v. State, 28 Fla. 511, 10 South. Rep. 106. And he may likewise on cross-examination be required to answer any proper question tending to discredit him. Eldridge v. State, 27 Fla. 162, 9 South. Rep. 448; Tischler v. Apple, 30 Fla. 132, 11 South. Rep. 273. And he may also be interrogated concerning matters which, if true, are in-

consistent with his direct testimony, or which render his statements on direct examination improbable, as these matters affect the credibility of his direct testimony.    Haynes v. Ledyard, 33 Mich. 319; State v. Eifert, 102 Iowa, 188, 65 N. W. Rep. 309, S. C. 38 L. R. A. 485; Kenyon v. Kenyon, 72 Wis. 234, 39 N. W. Rep. 361; Springside Coal Mining Co. v. Grogan, 67 Ill. App. 487; Olson v. Peterson, 33 Neb. 358, 50 N. W. Rep. 155; Yeaw v. Williams, 15 R. I. 20, 23 Atl. Rep. 33; Bagley v. Mason, 69 Vt. 175.   That the defendant's conduct with reference to demands for money made upon the parties named in the beginning of this paragraph, and as to his collecting money from them in pursuance of such demands, was a matter proper for the consideration of the jury upon the question of defendant's intent, we have already shown.   The objections to this testimony on cross-examination that it was irrelevant and immaterial were, therefore, properly overruled, and the only other objection interposed was that the evidence objected to was not properly in cross. The defendant had testified in his direct examination regarding the occurrences at the police station on Sunday, and to the imposition of fines upon certain of the State's witnesses there, that day.   The inquiries on cross-examination relating to these matters were entirely proper, as the witness had opened that matter for full consideration on direct examination.   His calling upon the parties and collecting the money in pursuance of the demands made at the police station, were but a continuation and completion of the transaction begun at the police station on Sunday, and in pursuance of appointments made that day.   Inquiries relating thereto were not only admissible under the rule which authorizes cross-examination into the whole of a com-

plete transaction a part only of which is inquired about
on direct examination, but they were proper as tending
to show a course of conduct, on defendant's part incon-
sistent with and tending to cast discredit upon his state-
ments on direct examination to the effect that what was
done at the "Sunday court" was in strict performance
of official duty, without any design to extort money by
malicious threats of criminal accusations, and that the
parties were on that day fined in the police court for
offences against the city ordinances upon trials regu-
larly conducted.

X. (1) On cross-examination of defendant the fol-
lowing questions were asked and answers given: (1)
Q. Did not you and McHugh go around at night and
visit whorehouses? A. Yes sir. (2) Q. For what pur-
pose did you go? A. On business. (3) Q. What kind of
business? A. Different kinds. (4) Q. Is it not a fact
that you went around to these whorehouses while you
were marshal? A. It is not a fact. Another inquiry
as to whether Wallace and McHugh were not in the
habit of visiting barrooms and drinking liquor on Sun-
day was objected to but no exception was taken to the
ruling thereon. The questions numbered 1, 3 and 4
above, were objected to as irrelevant and immaterial
and as tending to degrade and disgrace the defendant.
The defendant was then upon the stand as a witness.
In that capacity he was subject in every respect to the
rules governing the examination of other witnesses.
His position of defendant did not protect him from
answering every question proper to be asked any other
witness upon cross-examination. Every matter which
he had voluntarily opened up on direct examination he
could be required to disclose fully upon cross-examina-
tion, notwithstanding his answers would tend to crimi-

Wallace v. State.—Opinion of Court.

nate, degrade or disgrace him. Besides that being a witness and having denied any criminal intent and undertaken to justify his conduct on the Sunday in question, by stating that a police court was being held, and fines imposed, instead of extorting money by threats, his credibility was a very material matter to be considered by the jury, the same as any other witness in the case. For the purpose of discrediting a witness a wide range of cross-examination is permitted as a matter of right in regard to his motives, interest or animus as connected with the cause or with the parties thereto, upon which matters he may be contradicted by other evidence, and a like range of cross-examination is in the discretion of the trial court allowed into the past life and history of the witness and as to his present employments and associates, when the matters inquired about tend to effect credibility, and while answers to questions of this nature are conclusive upon the party asking them, and may be wholly irrelevant as to the direct question of defendant's guilt, and may tend to degrade or disgrace the witness, they are not for these reasons only to be disallowed. But if answers to questions of this nature would tend to criminate the witness and he claims his privilege of declining to answer, they should be disallowed. The matter rests in the sound judicial discretion of the trial court who must judge of their propriety from what transpires upon the trial, and the course and conduct of the witness upon the stand. The discretion of the trial court in this respect will not be interferred with unless abused, and the rule which we have announced applied to the cross-examination of a defendant when he voluntarily offers himself as a witness, to the same extent and with like limitations as to other witnesses. People v. Webster,

139 N. Y. 73, 34 N. E. Rep. 730; State v. Bacon, 13
Oregon, 143, 9 Pac. Rep. 393; State v. Murphy, 45 La.
Ann. 958, 13 South. Rep. 229; Smith v. State, 64 Md.
25, 20 Atl. Rep. 1026; Hanoff v. State, 37 Ohio St. 178,
S. C. 41 Am. Rep. 496; People v. Hite, 8 Utah, 461,
33 Pac. Rep. 254; Hill v. State, 42 Neb. 503, 60 N. W.
Rep. 916; State v. Pfefferle, 36 Kan. 90, 12 Pac. Rep.
406; State v. Kent, 5 N. Dak. 516, 67 N. W. Rep. 1052;
People v. Noelke, 94 N. Y. 137, S. C. 46 Am. Rep. 128;
Burdette v. Commonwealth, 93 Ky. 76, 18 S. W. Rep.
1011; 3 Taylor on Evidence, (9th ed. notes by Cham-
berlayne), note page 978 [39.]    The rules which should
govern the trial court in exercising its discretion in al-
lowing or disallowing inquiries into collateral matters
to affect credibility, do not authorize any question to
be put for the sole purpose of disgracing the witness.
The court should disallow all inquiries into collateral
matters which do *not tend to affect credibility*.    The in-
quiry must in general though not necessarily always
relate to transactions comparatively recent, and the
transaction inquired about must be one which bears di-
rectly upon the present character or credit of the wit-
ness.    Inquiry into collateral matters should not be
permitted unless there is reason to believe it may tend
to promote the ends of justice, and it seems essential to
the true estimation of the witness' testimony by the
jury.    The court should promptly suppress all inquiry
into matters not relevant to credit and should not per-
mit a disparaging course of examination which seems
unjust to the witness and uncalled for by the circum-
stances of the particular case.    Great Western Turn-
pike Road Co. v. Loomis, 32 N. Y. 127, S. C. 88 Am.
Dec. 311; Carroll v. State, 32 Tex. Cr. Rep. 431, 24 S.
W. Rep. 100.    Tested by these rules we can not say

that the court abused its discretion in permitting the questions stated. They were framed so that an affirmative answer would secure an admission of the conduct inquired about while Wallace was marshal and McHugh mayor, and such conduct would have constituted an antecedent in the life of Wallace the knowledge of which would assist the jury in placing an accurate estimate upon his statements as a witness. Greenleaf on Evidence, §§455-459. The questions being proper if the answers were objectionable the defendant should have moved to strike them. Ortiz v. State, 30 Fla. 256, 11 South. Rep. 611.

(2) Another question objected to as irrelevant and immaterial was: "Didn't Mr. McNeil in his sermon about which we have been talking say that you and McHugh were in the habit of laying around barrooms on Sunday and ringing up drinks with electric bells?" to which he replied, "I did not know he said it in his sermon." The State's theory evidently was that McNeil's sermon had given public notoriety to the "Sunday court," that reading this sermon and hearing it discussed caused Wallace and McHugh to know that they were suspected of improper conduct as officers and with respect to the "Sunday court," and in consequence thereof to suppress evidence by purloining the turnkey's docket. The defendant to show that this theory was untrue stated on direct examination that he had read the sermon and there was nothing in it to hurt him. The question asked on cross-examination was proper, because if answered affirmatively it would have tended to show that there was something in the sermon which hurt him. The answer, however, denied that the sermon contained the charge asked about, and the State offered no evidence to contradict it.

37

XI. The defendant requested and the court refused an instruction which, among other things, told the jury that "in order to convict the defendant you must be convinced from the information beyond all reasonable doubt that the defendant as marshal of said city made the threat charged in the information, and that such threat was maliciously made;" that the truth of the matter as to whether Marie Anderson did not keep a bawdy-house was to be considered by the jury as bearing upon the question of defendant's intent, or whether the threat was maliciously made, and that if the jury believed from the evidence that a threat was made by defendant to accuse Marie Anderson of keeping a bawdy-house against the ordinances of the city of Pensacola, but that the threat was made by him as a public officer, in good faith, without malice toward Marie Anderson or intention to extort money from her, they should find him not guilty. This instruction did not require the jury to base their verdict upon the evidence in the case, but authorized them to "be convinced from the information" of the facts necessary to find him guilty. In all other respects the substance of this instruction was embraced in the general charge of the court, and it was properly refused.

XII. Another instruction requested by the defendant and refused by the court was to the effect that keeping a bawdy-house was an offence against the State laws as well as the city ordinances, and that if the jury believed from the evidence that threats were maliciously made by defendant to accuse Marie Anderson of keeping a bawdy-house and that such threats were of an offence under the laws of the State, instead of the ordinances of the city, "and no threats relating to the ordinances of the city having been made," then they

should find defendant not guilty. This instruction was properly refused because it not only assumed as a fact that no threats relating to the city ordinances were made by defendant, while there was evidence to the contrary, but because there was no evidence of a threat to accuse Marie Anderson of any offence under the laws of the State.

XIII. The defendant requested the court to instruct the jury to the effect that under the ordinances of the city of Pensacola it is the duty of the marshal to obey the orders of the mayor, to cause the police force to obey the same, and to attend to the mayor's office whenever the mayor directs him to do so. These instructions correctly defined certain duties of the marshal under the ordinances mentioned, but we do not think the court erred in refusing them, because they would have had a tendency to mislead the jury into the belief that however illegal and with whatever criminal intent defendant may have acted on the occasion shown by the evidence, if he was obeying the orders of the mayor, he was simply performing an official duty. The court instructed the jury that in considering the evidence they should keep in view two main facts to be proved by the State: first, did defendant maliciously threaten to accuse Marie Anderson of keeping a bawdy-house; second, if so, was the charge made with intent to extort money from her. After defining the words maliciously and intent, the court stated that the word intent in connection with extort signified a premeditated design on the part of the defendant to cause Marie Anderson to pay money which she had not legally been adjudged to pay and which defendant had no reason to believe she would be legally adjudged to pay, and that if the jury believed from the evidence beyond

a reasonable doubt that defendant in his capacity as city marshal, acting with Pat McHugh, as mayor, caused Marie Anderson to come before them on Sunday when no court was being held, and threatened her with prosecution for keeping a bawdy-house, and at the time had no good reason to believe that he was acting legally, and that the threat was made with intent on defendant's part to extort money from Marie Anderson, then they should find defendant guilty as charged; and that it was for the jury to say from all the evidence whether defendant did, as a matter of fact, believe that he was acting regularly and legally. No exceptions were taken to these instructions, and they seem to have fully covered the question as to the legality of defendant's acts and his belief in their legality, while the instruction requested by defendant would have conveyed the erroneous idea above stated.

XIV. The court instructed the jury that defendant is presumed by the law to be innocent; that the burden was upon the State to establish his guilt beyond a reasonable doubt; that "a reasonable doubt is a doubt for which you can give a reason. In other words, if the evidence of defendant's guilt satisfies you to such an extent as to leave you without a doubt that he may be innocent, for which you can give an intelligent reason, then it would be your duty to convict. Such a doubt may arise either from affirmative evidence tending to show the defendant's innocence or from the lack of evidence sufficient to establish his guilt." In Lovett v. State, 30 Fla. 142, 11 South. Rep. 550, this court very carefully and explicitly laid down a definition of the phrase "reasonable doubt," and while that definition, like all others that have ever been attempted, when closely analyzed, fails to convey a meaning much more

definite to the ordinary mind than the simple words "reasonable doubt," it has been repeatedly approved by the courts of this country, and it certainly carries as clear an idea of a reasonable doubt as any other combination of words ever attempted. As we have held that it is error to refuse to instruct the jury as to the meaning of reasonable doubt (Reeves v. State, 29 Fla. 527, 10 South. Rep. 901), and the phrase is so difficult of precise definition, it would be well for trial judges to adopt the well-settled definition declared in the Lovett case, rather than experiment with new formulas upon this branch of the law. We do not find that the exact language here used has ever been passed upon by an appellate court. An instruction to the effect that a reasonable doubt "is a doubt for having which the jury can give a reason based upon the testimony," was disapproved in Cowan v. State, 22 Neb. 519, 35 N. W. Rep. 405; Carr v. State, 23 Neb. 749, 37 N. W. Rep. 630, because, as the court said, it failed to correspond with the definition given by Chief-Justice SHAW in Commonwealth v. Webster, 5 Cush. 295, S. C. 52 Am. Dec. 711, though the court did not undertake to state the difference in the substantial meaning of the two definitions. In Morgan v. State, 48 Ohio St. 371, 27 N. E. Rep. 710, an instruction that "by reasonable doubt is not meant a captious or whimsical doubt, but a doubt that you as a juror can give a reason for," was held to be inaccurate. The court asked "what kind of a reason is meant? Would a poor reason answer, or must the reason be a strong one? Who is to judge? To whom is the reason to be given? To the juror himself? The charge does not say so, and jurors are not required to assign to others reasons in support of their verdict." Judge MINSHALL, however, dissented from

these criticisms upon the instruction, insisting that it was free from error. In Siberry v. State, 133 Ind. 677, 33 N. E. Rep. 681, an instruction that "a reasonable doubt is such a doubt as the jury are able to give a reason for," was condemned upon the ground that it puts upon a defendant the burden of furnishing to every juror a reason why he is not satisfied of his guilt with the certainty which the law requires, before there can be a conviction, and that we sometimes have doubts in relation to things for 'which we can give no reason, and of which we have imperfect knowledge. The accuracy of instructions of this nature was doubted in State v. Sauer, 38 Minn. 438, 38 N. W. Rep. 355, and People v. Stubenvoll, 62 Mich. 329, 28 N. W. Rep. 883. See, also, 3 Rice on Evidence, p. 437, §270. On the other hand, instructions to the effect that a reasonable doubt is "a doubt for which a reason could be given," or one "for which some good reason arising from the evidence may be given," or "a serious sensible doubt such as you could give a good reason for," or one "for which some fair just reason can be given, have been approved in Hodge v. State, 97 Ala. 37, 12 South. Rep. 164; Ellis v. State, 120 Ala. 333, 25 South. Rep. 1; People v. Guidici, 100 N. Y. 503, 3 N. E. Rep. 493; State v. Jefferson, 43 La. Ann. 995, 10 South. Rep. 199; United States v. Johnson, 26 Fed. Rep. 682; United States v. Jones, 31 Fed. Rep. 718; State v. Rounds, 76 Me. 123. The authorities *pro* and *con.* are very fully considered in State v. Morey, 25 Oregon, 241, 35 Pac. Rep. 655, and the court declined to reverse a conviction because the trial judge in his definition of reasonable doubt stated that it was "such a doubt as a juror can give a reason for." It was admitted that this language was subject to the criticism that it did not define; but

needed defining, but the court held that in connection with other instructions given upon the same subject the jury were not misled, and that case is approved in State v. Serenson, 7 S. Dak. 277, 64 N. W. Rep. 130; 2 Thomp. Trials, §2476. In People v. Barker, 153 N. Y. 111, 47 N. E. Rep. 31, it is said that a reasonable doubt must be founded in reason, and must survive the test of reasoning or the mental process of a reasonable examination. In this State we have held that the doubt authorizing an acquittal is a reasonable, sensible one, not an unreasonable, capricious, whimsical, speculative, imaginary or forced one, or a mere possible one or one which is suggested or engendered by something outside of the evidence. Lovett v. State, 30 Fla. 142, 11 South. Rep. 550; Woodruff v. State, 31 Fla. 320, 12 South. Rep. 653. We are of opinion that the instruction complained of does no more than to state in a different form the same thing as that defined in other language in the Lovett and Woodruff cases. It tells the jury that the burden is upon the State to establish defendant's guilt beyond a reasonable doubt—that is beyond a doubt for which they can give an intelligent reason—that this doubt may arise either from affirmative evidence tending to show innocence, or from lack of evidence sufficient to establish guilt; but that if the evidence of guilt satisfies them to such an extent as to leave them without a doubt that defendant may be innocent for which they can give an intelligent reason, they should convict. This instruction puts no burden upon the defendant to furnish the jury with a reason, but it requires the State to satisfy the jury of defendant's guilt to such an extent as to leave their minds without a doubt that defendant may be innocent, for which they can give an intelligent reason. Of course

the jury are not required to state reasons for their ver-
dict, but they are nevertheless required by the law and
by their duties as jurors to act in the jury box as rea-
sonable beings, and to exercise their reasoning facul-
ties in passing upon the life or liberty of accused per-
sons.   If they entertain a doubt they must as reason-
able men know upon what that doubt is based, and they
are required to examine into the nature and origin of
the doubt far enough to ascertain that it is a reason-
able one.   And if it be found that no intelligent reason
can be given for entertaining a doubt, how can the con-
science of the jury be satisfied with a verdict of acquit-
tal resting as it does under a solemn duty to convict
where the evidence convinces them of guilt to that ex-
tent as to leave no reasonable doubt upon their minds.
To authorize an acquittal because of some vague, unde-
fined, unintelligible or inexplicable · misgiving, is to
eliminate the word "reasonable" from the definition.

XV. The court instructed the jury that "the keep-
ing of a bawdy-house is an offence against the ordi-
nances of the city of Pensacola, and if the defendant
threatened to turn Marie Anderson over to the criminal
court for keeping a bawdy-house unless she paid money,
this would be threatening to accuse her of a crime
against the ordinances of the city of Pensacola."   The
only criticism upon this instruction suggested by plain-
tiff in error is that it authorized the jury to find defend-
ant guilty, although there was a substantial variance in
the proof, in that it authorized them to find him guilty
under an indictment charging malicious threats to ac-
cuse of a crime against the city ordinances upon proof
of malicious threats to accuse of a crime against the
State laws.   There being no evidence whatever of a
threat to accuse Marie Anderson of a crime under the

State laws, or to turn her over to any State criminal court, we must assume that the jury understood the judge to mean by the term "Criminal Court" the court authorized to try offences against the ordinances of the city. There is nothing in the language of the charge which indicates that the judge had reference to the "Criminal Court of Record of Escambia County," or any other court having jurisdiction of State offences, and there was certainly no evidence which even suggested a threat on defendant's part to accuse Marie Anderson of an offence under the State laws. If the jury understood the instruction in the light of the evidence, as we must assume that they did, they could not have understood from the charge that a variance of the nature suggested would be immaterial.

XVI. The only other assignment of error argued, except the one discussed in the next succeeding paragraph of this opinion, relates to the order overruling the motion for a new trial. This assignment presents the question as to the sufficiency of the evidence to sustain the conviction. We are of opinion that the evidence is sufficient to sustain the verdict, and that the court below committed no error in overruling the motion for a new trial.

XVII. It is insisted that the sentence imposed by the court is vague and indefinite, in that it requires the imprisonment to begin at the "expiration of first sentence," without stating the nature, duration or time of expiration of the first sentence, or by what court it was imposed. Some of the American courts hold that without an express statute authorizing it, the sentence in felony cases can not be so framed as to make the term of imprisonment begin at the expiration of a former sentence, but we hold that under the discretion vested

in the judges in this State as to the duration of terms of imprisonment to be fixed by them upon convictions for felonies, and in accordance with common law principles and the manifest intention of our criminal laws to punish separately each offence committed against them, that in all criminal convictions where the sentence is to a term of imprisonment, the court can in its discretion fix the term so that it will begin at the expiration of a former sentence. Russell v. Commonwealth, 7 Serg. & R. 489; Kite v. Commonwealth, 11 Met. 581; Williams v. State, 18 Ohio St. 46; *In re.* Packer, 18 Colo. 525, 33 Pac. Rep. 578; 1 Bishop's Crim. Proc. §1327. While this may be done, it is of great importance to the prisoner that the sentence should be definite and certain so as to advise him and the officer charged with its execution of the time of its commencement and termination, without being required to inspect the records of another court, or the record of another case. Picket v. State, 22 Ohio St. 405; 1 Bishop's Crim. Proc. §1297. The sentence in this case refers to a "first sentence," but there is nothing in this record, or in the language of the sentence to advise us for what offence or in what court such "first sentence" was imposed, or when it began, or where it was to be executed, or for what period of time it was imposed. The sentence is erroneous because vague and indefinite.

We find no error in the record sufficient to reverse the judgment against the defendant, except in the sentence imposed. This error does not authorize us to grant a new trial in the case, but only to reverse the judgment and remand the cause for the imposition of a proper sentence. Williams v. State, 18 Ohio St. 46; Bueno v. State, 40 Fla. 160, 23 South. Rep. 862.

Because of the error in the sentence the judgment

is reversed, and the cause remanded with directions to the court below to pass proper sentence upon the defendant in accordance with law.