OLIVER WARD, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

1. Upon the prosecution of one charged with murder, evidence offered by the State to show that the deceased was a member of a group of young men who were accustomed to commit breaches of the peace upon the premises where defendant was employed, and with one of whom he had had a difficulty and concerning whom he had said that he would put a stop to their carousals if he had to kill one of them "just to see how he looked dead," is admissible as tending to show a premeditated design on the part of the defendant to kill a human being, and as tending to show who began the difficulty, even though it is not shown that the deceased was personally known to the defendant.

2. Upon the trial of one charged with murder in the first degree, error in admitting evidence to show premeditation is cured by a verdict of manslaughter.

3. Error in excluding a question framed to elicit competent and relevant testimony may be cured by the subsequent admission of the testimony from another witness.

4. The rule upon the subject of the admission in evidence of dying declarations requires that it be first shown to the satisfaction of the court that the deceased not only considered

death imminent, but that he believed that he was without hope of recovery.

5. A dying declaration to be admissible must also be confined to the *res gestae*, and there is no merit in an objection that there is other testimony upon the same matters.

6. If a ruling by the trial court admitting testimony does not clearly appear to have been erroneous, the ruling will not be disturbed.

7. A motion should be made to strike an improper answer of a witness to a proper question propounded. If that course is not followed the party objecting will not be heard to complain here, because for aught that appears the objection was abandoned in the lower court. .

8. A question propounded to a witness called to testify as to dying declarations which sought to elicit information as to whether the deceased realized his condition to be serious, and whether he had any hope of recovery, is proper.

9. In examining a witness upon the subject of dying declarations it is improper and may lead to reversible error to lead the witness and suggest a thought. Such practice may be productive of harmful results when the witness ascribes the thought so suggested to the deceased and undertakes to clothe it in his, the witness' own words. The better practice is to request the witness to repeat what the dying man said about the difficulty. If any part of the testimony is inadmissible as evidence it may be stricken on motion.

10. A motion to strike testimony should be restricted specifically to that part of it which is objectionable. When the motion to strike is so broad as to include proper evidence it will be denied although some parts of it is inadmissible.

11. If the trial judge errs in allowing one witness to give improper evidence, it is no ground for reversal that he refuses to allow another witness to give the same evidence.

12. The instructions of the court to the jury should be considered in their entirety, and if when so considered it appears that the charge so far as it bears upon any subject is sound, an assignment of error based upon an isolated portion of the charge will fail, even though when such portion considered alone is erroneous.

13. An instruction upon justifiable homicide in which the expression "present imminent danger" is used in lieu of the statutory phrase "imminent danger," may be erroneous when considered with reference to the facts in the case.

14. An instruction upon the law of self defence which directs the jury that the defence is not available unless the defendant's "belief of danger is real," is not erroneous, because the imminency of danger to the defendant when he struck the fatal blow must not only be reasonably apparent, but the defendant must also believe the danger to be imminent.

15. Instructions to the jury are required to be applicable to the evidence and a requested instruction upon the "defendant's theory" which is not applicable to the evidence is correctly refused.

16. An assault upon one with a deadly weapon is not in law *ipso facto* a justification of that one in taking the other's life. The existence of imminent danger reasonably apparent is a matter of fact for the jury to determine from the evidence.

17. An instruction that a person who occupies the position with his employer of "Quarter Boss" is clothed with no legal authority to make arrests and has no more power in that regard than any other private citizen, is not erroneous.

18. An instruction which directs the jury that a "deputy sheriff or other officer has no authority to molest, apprehend or attempt to arrest any person, although such person may be guilty of a breach of the peace, unless such offence was committed in the presence of the deputy sheriff, or amounted to a felony, unless the deputy sheriff or other officer is author-

ized to make such arrest by reason of a warrant duly issued by a court of competent jurisdiction," does not correctly state the law; but such instruction will not be deemed sufficient to cause a reversal of the judgment when the evidence shows that the defendant made no attempt to arrest the deceased.

19. An instruction upon the law of self defence that the defendant may not avail himself of that defence, if he killed the deceased in a difficulty brought about by the defendant's wrongful act in being the aggressor, is not erroneous.

20. Evidence examined and found sufficient to support a verdict of manslaughter.

Writ of Error to Circuit Court for Lafayette County, M. F. Horne, Judge.

Judgment affirmed.

Hal W. Adams, J. M. Gornto and W. B. Davis, for Plaintiff in Error;

Van C. Swearingen, Attorney General, and C. O. Andrews, Assistant, for the State.

ELLIS, J.—The plaintiff in error Oliver Ward, hereinafter referred to as the defendant, was indicted in 1916 by the grand jury of Lafayette county for the murder of Arthur Land which was alleged to have been committed on the 25th day of December, 1915. In November, 1917, the defendant was put upon trial for the offense charged and convicted of manslaughter. He seeks to reverse the judgment of conviction and comes here by writ of error.

The errors assigned are numerous and are all based upon rulings of the court upon the admission and rejec

tion of evidence, the giving and refusing of certain instructions and the ruling denying a motion for a new trial.

Arthur Land was killed by the defendant under circumstances which the latter claimed justified him. The defendant was "Quarter boss" at the Standard Lumber Company's mill at Alton, Florida, and a deputy sheriff of Lafayette county. On the night of December 24th, 1915, a negro came to the defendant and told him that there were "some white men over at Jerry Franklin's house shooting at them (the negroes) and trying to make them dance." The defendant and Otis Hunt went to Franklin's house. The defendant went in first and walked up to the fire place where the deceased Arthur Land was standing. According to the defendant he did not know who the man was and "started to look under his hat to see who he was" when the deceased "shoved a pistol out against" the defendant's stomach, who hit him on the *back* of the head and knocked him down. Mr. Hunt then ran up. According to his testimony Land fell on his face with his arms *extended* in front of him and with his right arm very near the fire. Hunt assisted Land to rise by taking hold of the latter's left arm and placing his own left hand upon Land's right side. Hunt "did not notice at that time whether or not Land had a pistol in his hand" and did not notice it until Hunt saw Land's hand on Hunt's shoulder. Further testifying he said: "I do not know where he got that pistol from." While the two men were standing in this position facing each other Hunt supporting Land whose right hand or arm was on Hunt's shoulder, the defendant said: Land "pointed a pistol at me over Hunt's shoulder, *or* in my direction. I said 'Don't you do it,' he did not stop, but kept it right there. I jumped

behind Mr. Hunt and reached over his shoulder and fired." Land received the bullet, which was fired from a 38 calibre pistol, in the left shoulder near the neck. The bullet ranged downward and backward. He died a few days afterward from that wound. When Land's body was examined the night he was shot his wife said, "there was a wound on his head, and another where he was shot with a pistol. There was a skinned place on the chin and nose."

Assignments of error from one to nine inclusive are based upon exceptions to certain testimony of a witness named Ras Mickler. Mickler testified over the defendant's objection and exception regularly made and preserved, that a few weeks before the deceased was killed the witness had a conversation with the defendant in regard to the "Land boys;" that Henry Land and Ward the defendant had had a fight, that there was another Land boy named Lonzo, they would get drunk at night and go into the quarters and "raise much sand." Oliver Ward was quarter boss and said he was "going to put a stop to it if he had to kill one of the G—d—sons of bitches to see how he looked dead." The witness was asked by the State Attorney if "Ward at that time" knew the name of any particular one of the Land boys or "were you talking about the bunch generally." The reply was "Lands in general." The witness also testified that the defendant did not at that time indicate any certain one of the Land boys whom he might kill to "see how he looked dead;" that the witness knew only Lonzo Land at that time. On cross-examination defendant's counsel said to the witness: "The duty of the quarter boss is to keep order in the quarter?" This statement was interrogatively made and was objected to by the State Attorney and the objection was sustained.

This ruling is the basis of the eighth assignment of error. The other assignments of error from one to nine inclusive attack the propriety of the evidence above mentioned.

Upon cross-examination by defendant's counsel the threat against the Lands was again brought out, the witness saying that the defendant "said that he was going to kill some one of them if they did not stop" coming through the quarters and raising disturbances.

The State produced a witness, R. L. Land, who testified that he knew a "bunch of boys" around the community of Alton known as the "Land boys." This without objection. Then over defendant's objection and exceptions duly made, the witness testified that the boys "ran together;" that "there was a dozen or more right around there that were together a whole lot of the time;" that his sons Arthur and Henry and Lonzo were included among those referred to as "the bunch." On cross-examination the defendant's counsel elicited from the witness what he meant by the boys running together. He said: "they were together a lot of the time, going around together and beating about as boys will do." That he supposed they would get together during the day as well as at night. That the deceased was the only one of the Land boys who was in the "quarters" that night. The overruling of the defendant's objection to this evidence constitutes the basis of the tenth, eleventh, twelfth, thirteenth and fourteenth assignments of error. On cross-examination the witness was asked by the defendant's counsel the following question: "What I want to get at is this: do you know of your own personal knowledge that Arthur Land went with the rest of the boys into the quarters?" The State

Attorney objected to the question upon the ground that it was a repetition. The objection was sustained and the ruling is assigned as the fifteenth error.

We have grouped these assignments of error because conceding that the objections and exceptions were duly made and preserved to each question as the evidence was developed yet it should be considered in its entirety to determine its admissibility, which is questioned by these assignments of error upon several grounds. The evidence was offered to show premeditation on the part of the defendant to kill the deceased. The evidence tended to establish the fact that the deceased was the associate of other boys or young men who went about in a group known as the Land Boys and committed disturbances at night in the neighborhood. A gang of roughs who occasionally invaded the "quarters" of the Mill Company and disturbed the peace with one of whom the "quarter boss and deputy sheriff" had had a fight. That the resentment of the defendant was aroused against the entire gang or "bunch" as it was called, and that he proposed to put a stop to its breaches of the peace in the quarters even if had to resort to extreme measures.

Murder in this State is committed if the killing is unlawful and results from a premeditated design to kill any human being. So if the defendant went to Franklin's house that night with a premeditated design to kill any member of the so-called "bunch" or group of young men and pursuant to that design shot and killed the deceased, the evidence was admissible upon the charge of murder even though it was not shown that the defendant knew at the time he went there that the deceased was a member of the group. It was also admissible to show who began the difficulty. It was com-

petent evidence to be given such weight by the jury as they under all the circumstances thought proper. Rawlins v. State, 40 Fla. 155, 24 South. Rep. 65; Hodge v. State, 26 Fla. 11, 7 South. Rep. 593; Owens v. State, 65 Fla. 483, 62 South. Rep. 651; Hall v. State, 70 Fla. 48, 69 South. Rep. 692. The objections raised by counsel to this evidence were that the threats made by the defendant were indefinite, the reference to the Land boys being too general, and the time when the alleged threat was made was too remote and the threat did not appear to be directed against the deceased. The case, cited by counsel of State v. Nelson, 165 Mo. 191, 65 S. W. Rep. 749, does not announce a rule contrary to that which obtains in this State upon the subject of threats by the defendant to show premeditated design to kill. This court has held that a threat to kill "someone" is admissible and that the killing of one person while intending to kill another that is to say from a premeditated design to kill some other person constitutes murder. See the cases above cited.

But even if there was error in the admission of the evidence it was cured by the verdict of the jury which found the defendant guilty of manslaughter thus discarding the State's theory of a killing from a premeditated design and acquitting the defendant of the charge of murder. See Bell v. State, 65 Fla. 505, 62 South. Rep. 654; Smith v. State, 66 Fla. 135, 63 South. Rep. 138.

The eighth assignment of error which is based upon the court's ruling sustaining the State Attorney's objection to a question propounded to the witness Mickler on cross-examination which sought to elicit information as to the defendant's duty as "quarter boss," can not be sustained because while we think the question was a proper one at the time and should have been answered,

the error was subsequently cured by the defendant himself who said that he went to the house in his "official position as deputy sheriff of Lafayette county" to "quell the fuss and stop it, and also to investigate and see if the report of the negro was true."

Mrs. Drew Land, the wife of the deceased, testified that she was at R. L. Land's house the night her husband was brought home. After describing his wounds she said: "After he came out from under the influence of this anesthetic he made a statement to me as to how he felt and his belief as to whether he would live or not. He said he knew that he would never get well and that it would be just two or three days; that he would never (get) over it." That he never changed his mind. That he lived from Friday night until Tuesday twelve o'clock. "Q. From the time that he came out from under the anesthetic until he died did he express any hopes of recovery, but said all the time he would die from the wounds? Yes sir. Q. While in that condition did he tell you how he got these wounds? Yes sir. Q. What was the attitude of Arthur Land with reference to any hope of recovery from the time that he became consicous until the time of his death? A. He did not have any hopes at all." The defendant's counsel moved to strike the last answer upon the ground that it was the opinion and conclusion of the witness. The motion was denied and the ruling is made the basis of the fifteenth assignment of error. The witness was then asked if the deceased at any time expressed any hopes of living and the witness answered no. "Q. What did he say with reference to his condition and results of these wounds? A. After he got his consciousness from taking that stuff he said that he would never get well because these wounds would kill him. Q. How long

did he live? A. Not more than two or three days. Q. He was satisfied that these wounds would kill him? A. That is what he said. Q. How many times did he make this statement? A. He made that statement to me a half a dozen times and the other members of the family heard it. Q. How long before he died did he say that? A. The morning that he did die he said it. Q. What time did he die? A. He died at twelve o'clock. Q. And he made that statement, that he would not live and that he was going to die and that these wounds would kill him? A. Yes sir. Q. Did he ever express any hopes of doing anything but dying from those wounds? A. He said that he knew that he would not get well. Q. Where was he when he made these statements? A. He was at his father's. He was carried there and put to bed and he was there all the time until death took him; right there in the fireplace room. Q. He was on the same bed when he made these statements to you? A. Yes sir, the same bed and the same place. Q. He was not at any time ever able to leave that bed? A. No sir. Questions asked by the Court: Q. When was it that he made these statements to you about he was wounded? A. He made it a half a dozen times. Q. When was the last time? A. I told you just now; I guess that was about nine o'clock when he said it the last time. Q. It was about nine o'clock that he told you that he was going to die? A. Yes sir. Q. What did he tell you about how he got wounded, and how many times did he tell you that? A. I said that it was about nine o'clock of the day that he died. He died at twelve o'clock. Q. Was Arthur Land at the time he made these statements conscious and in his right mind? A. Yes sir. He knew what he was talking about." The witness was then requested to tell what the deceased said as to how and

in what manner he received his wounds. The defendant objected upon several grounds to the witness testifying and the request. seems to have. been abandoned. The State Attorney then directed the witness to "Tell the jury what Land told you while he was in the condition that you have described occurred in that house; tell them how he came to be in the house, what position he was in and all that happened in there." The defendant again objected to the witness testifying, upon the ground that "no proper predicate had been laid for the question and testimony it undertook to elicit;" that it had not been shown that the deceased was at the time without hope of recovery; that the question does "not go to statements as to what actually happened at the time of the homicide," nor did it enquire as to the identity of the participants in the affair nor as to the position of the parties nor the instrument used, and upon the further ground that the State had produced a witness who had testified to the "facts with reference to the homicide." The witness answered as follows: "He told me that he was in the house there, leaning up and warming by the fire and the door opened and Ward came in with the pistol in his hand and knocked him down and he fell on the fireplace. That Otis Hunt took hold of him and lifted him up and held him and that he asked Ward to please not kill him away from his wife and little children and Ward did the shooting while Hunt held him for him to shoot him." The witness was then asked if the deceased stated whether he had a weapon in his hands when the defendant shot him. To this question defendant's counsel also objected upon the same grounds. The objection was overruled and the ruling was made the basis of the twentieth assignment of error. The witness answered: "I did not hear him

say that." The witness was then asked the following question: "What did he say he was doing in there?" This question was also objected to and the objection overruled. The witness answered: "He was just in there by the fire warming; he was not doing any one any harm at all." This ruling was made the basis of the twenty-first assignment of error.

We think there is no reversible error in any of the rulings which were made the basis of the assignments of error numbered from sixteen to twenty-one inclusive.

The rule, for laying the foundation for the admission of dying declarations, as recognized by this court was fully complied with. It was shown that the deceased not only considered himself in imminent danger but he believed he was without hope of recovery. He said to his wife that he knew he would never get well, that it "would be just two or three days;" that he would never get over it. His wife said that he never changed his mind and died in about three days and a half. It also appeared that the declaration were made upon the day the deceased died, and within a few hours of his death which he seemed to realize, from the moment he was carried home, was inevitably approaching. The law considers that a situation so solemn and so awful creates an obligation equal to that imposed by an oath administered in court to speak the truth. See Dixon v. State, 13 Fla. 636; Savage and James v. State, 18 Fla. 909; Lester v. State, 37 Fla. 382, 20 South. Rep. 232; Green v. State, 43 Fla. 552, 30 South. Rep. 798; Newton v. State, 51 Fla. 82, 41 South. Rep. 19; Copeland v. State, 58 Fla. 26, 50 South. Rep. 621; Fails v. State, 60 Fla. 8, 53 South. Rep. 612.

There is no merit in the objection that a witness was

present when the homicide was committed and had testified as to the facts and circumstances of the killing.

The discussion of counsel for the defendant upon these assignments is very full and their criticism of the method of examination of the witness quite just. Many of the questions were leading and some not at all clear, but these questions were of a preliminary character and sought to ascertain the belief of the deceased as to his real condition and hope if any of recovery. As to the declarations, they related only to the *res gestae*. The declarant told where he was, who came in the house, what the defendant and Ward did to him and what was said. See Savage and James v. State, *supra;* Clemmons v. State, 43 Fla. 200, 30 South. Rep. 699.

The admission of the evidence by the court below does not clearly appear to have been erroneous, so the ruling should not be disturbed. Malone v. State, 72 Fla. 28, 72 South. Rep. 415.

The question of the State Attorney in which he asked the witness, "What did he say he was doing in there?" was objetced to by the defendant. While that method of examining a witness as to dying declarations is not approved, we are not prepared to say the question resulted in the commission of reversible error by the court in overruling the objection to it. If the deceased in his dying declaration had said what he was doing in the house at the time of the assault upon him it would have been admissible as part of the *res gestae*. The objection to the question therefore was properly overruled. The witness' answer however was clearly not responsive to the question. The defendant did not move to strike the answer. The witness said "He was just in there by the fire warming; he was not doing any one any harm at all." This was the witness' opinion appar-

ently, but the defendant should have moved to strike it. See Mann v. State, 23 Fla. 610, 3 South. Rep. 207; Ortiz v. State, 30 Fla. 256, 11 South Rep. 611; Putnal v. State, 56 Fla. 86, 47 South. Rep. 864; Golden v. State, 54 Fla. 43, 44 South Rep. 948. Failing to do so, for aught that is shown here he abandoned his objection. See Ortiz v. State, *supra*.

The answer to the question which is made the basis of the eighteenth assignment was harmless. The witness said she did not hear her husband make any statement about having a pistol.

Much has been said by this court upon the subject of dying declarations. The rule is recognized that great care should be exercised by the trial court in admitting such evidence. The reason for the rule is obvious. Dying declarations are a species of hearsay evidence, the person whose declarations are thus received is not sworn, neither is he subject to cross-examination. The declarations are made when the declarant is in the presence of death, usually suffering great pain and may speak under more or less emotion, if not excitement, but having been admitted by the court in its discretion these objections may affect the credibility of such evidence and are matters for consideration by the jury.

Assignments of error numbered from twenty-two to twenty-five inclusive rest upon objections to certain questions propounded by the State Attorney to the witness R. L. Land. The witness had testified that he arrived at the house, where his son was taken after being shot, the following night at about seven or eight o'clock. That the deceased discussed the "difficulty" with his father after stating that (he) the deceased "could not live but would die." The witness was then asked whether the deceased "asked for or objected to any

extra expense or attention on account of thinking that
he could not live and if so what he said." This question
was objected to by the defendant's counsel upon the
grounds that the "question is irrelevant and imma-
terial." The objection was overruled. We think prop-
erly. The question was intended to elicit information
as to whether the deceased realized his condition to be
serious, and whether he had any hope of recovery. The
answer clearly showed that the deceased believed he
would die from his wounds and had abandoned all hope
of recovery. The witness said that several times when
he tried to straighten the bandages the deceased said
"not to bother him, that he could not live and that it
was no use to worry him and that the bandage did hurt
him, but that he was shot through the lungs and could
not live." The State Attorney then directed the witness
to "state what he (the deceased) told you about it."
This was somewhat vague but it was no doubt the pur-
pose of the State Attorney to obtain from the witness
a statement of what the deceased said about how the
shooting occurred. Practically the same objection was
made as the defense had made to the testimony of Mrs.
Land and the objection was overruled. No motion was
made to strike the answer of the witness which was as
follows: "I asked him how Ward came to shoot him;
he said he didn't know; that he had gone in there to
warm and Ward came in and never said a word and
walked up to him and struck him over the head with his
pistol and not a word was spoken before he hit him."
This reply was not improper evidence, but if it was, the
defendant by not moving to strike it abandoned his
objection as we have shown. The next question pro-
pounded to the witness was: "Did he tell you whether

or not he had a pistol out when Ward struck him?" It is seldom proper, not often permissible to lead one's witness and we think that a witness who is called to establish dying declarations should, after the proper foundation has been laid for such evidence, be requested merely to repeat as nearly as possible what the deceased said. If in repeating what was said it appears that any part of the statement is not admissible it may be excluded upon proper motion. The method of examination pursued in this case may produce harmful results in that it may suggest a thought which the witness might unconsciously ascribe to the deceased and undertake to clothe it in his own words. Such an error was probably committed by Mrs. Drew Land who after having been interrogated as to the dying declarations of her husband, was practically cross-questioned by the State Attorney as to different parts of the statement and finally she was asked "what did he say he was doing in there." In undertaking to repeat what the deceased said she had already stated that he "told me that he was in the house there, leaning up and warming by the fire," but she answered by saying: "He was just in there by the fire warming; *he was not doing any one any harm at all.*" It is very apparent that the answer expressed the witness' thought; it did not repeat the deceased's words. But as no motion was made to exclude the answer it remained in evidence and so far as it appears the objection was abandoned as we have shown. In reply to the above question, *viz,* "Did he tell you whether or not he had his pistol out when Ward struck him" the witness said: "He never said anything about that at all." So whatever vice there may have been in the question was cured by the answer. The next question was: "Did he tell you whether or not he was

attempting to do anything to any one?" The defendant objected to this question. The objection was overruled, and no motion made to strike the answer, which was "He said he was not disturbing any one at all." While we do not hold this method of examination to be proper, nor the answers to the questions responsive, we cannot sustain the assignments of error because whenever an improper answer is made to a proper question the party objecting should follow his objection with a motion to strike the particular part of the answer which is not admissible. If this is not done there is nothing in the record to show that the objection was not waived. And as there was ample ground in the testimony of the defendant himself to support the verdict it would not be permissible to disturb it because of the admission of such evidence.

The defendant moved to strike the testimony of Mrs. Land and Mr. Land "with reference to dying declarations that are claimed to have been made by Arthur Land." The grounds urged in support of this motion were the same as those to which reference has been made in discussing Mrs. Land's testimony. The motion was overruled and the court's action is made the basis of the twenty-sixth assignment of error. The motion was very broad. It covered all the testimony of the two witnesses relating to the dying declarations of Arthur Land, much of which testimony we have shown to be admissible. The motion should have been restricted to that part of the testimony which was objectionable, otherwise if any part of it was admissible the motion was properly denied. See Freeman v. State, 50 Fla. 38, 39 South. Rep. 785; Putnal v. State, *supra;* Cook v. State, 46 Fla. 20, 35 South. Rep. 665; Alford v. State, 47 Fla. 1, 36 South. Rep. 436; Thompson v. State, 52 Fla. 113,

41 South. Rep. 899; Johns v. State, 46 Fla. 153, 35 South. Rep. 71; Lewis v. State, 55 Fla. 54, 45 South. Rep. 998.

The defendant testified as a witness in his own behalf. He said that he went to Jerry Franklin's house; that Otis Hunt was with him when the "party came and made this report" to him. He was then asked: "What was it that the party who made the report said to you?" The question was objected to and the objection sustained. The ruling is assigned as the twenty-seventh error. We think the objection was properly sustained. Counsel for defendant insist that because they did not object to the State witness Hunt's testimony when he told what the negro said to the defendant, the court should not have sustained the State's objection to the question which sought to elicit from the defendant his version of the negro's "report." They cite no authority either text-book or decision in support of such contention, and as we recall none we hold the point not well taken.

The next assignment of error is the thirtieth, the twenty-eighth and twenty-ninth having been abandoned. It is insisted that the following charge given to the jury was erroneous: "If the evidence in this case should convince the jury beyond a reasonable doubt and to a moral certainty that the defendant in Lafayette County, Florida, at any time within two years immediately preceding the finding of this indictment unlawfully killed Arthur Land in the manner and by the means charged in this indictment and the jury should not find from the evidence beyond a reasonable doubt that such killing was perpetrated from and with a premeditated design on the defendant's part to effect the death of Arthur Land, and the jury should not find from the evidence beyond a reasonable doubt that such killing was perpetrated by an act immediately dangerous to another and evincing a

depraved mind regardless of human life, then the jury
should find the defendant guilty of manslaughter." The
judge had previously defined murder in the second degree
and manslaughter.   It is true that in defining murder
in the second degree he used the word "immediately" for
the word "imminently" used in the statute and in defin-
ing manslaughter he did not follow the wording of the
statute.   We will not discuss the two words "immediate"
and "imminent."   The jury did not find the defendant
guilty of murder in any degree, so that mistake of the
court becomes harmless.   Mathis v. State, 45 Fla. 46,
34 South. Rep. 287.   The other experimentation with
the statue we think was also harmless.   The *unlawful*
killing of a man when such killing is not murder in any
degree is manslaughter, at least so far as the facts of
this case are concerned.   See Stone v. State, 57 Fla.
28, 48 South. Rep. 996.   We think however that where
it becomes necessary to define a statutory crime to a
jury the statute should be literally followed.   Considered
alone the instruction was erroneous because, in it the
jury were told that if they did not find the defendant
guilty of murder in the first or second degree, they should
find him guilty of manslaughter.  This instruction
apparently eliminated the defense of justifiable or excus-
able homicide.   This court however has repeatedly said
that the judge's instructions to the jury should be con-
sidered in their entirety.   Every instruction bearing
upon the same point should be considered and if when
that is done the charge considered as a whole is sound
the assignment of error based upon some exception to
the charge must fail.   See Mathis v. State, *supra;* Starke
v. State, 49 Fla. 41, 37 South. Rep. 850; Douglas v. State,
53 Fla. 27, 43 South. Rep. 424; Davis v. State, 54 Fla.
34, 44 South. Rep. 757; Padgett v. State, 64 Fla. 389, 59

South. Rep. 946; Disney v. State, 72 Fla. 492, 73 South. Rep. 598. The charge complained of was immediately followed by an instruction which informed the jury that before the defendant could be found guilty of any offense the jury must be able to find from the evidence beyond a reasonable doubt that the homicide was unlawful and that if the defendant killed Land and in doing so acted in self defense he was justified and should be acquitted.

The court then chargegd the jury upon the law of self defense. This charge is the subject of the next assignn.ent of error.

We deem it unnecessary to set out the charge at length. The counsel for defendant fiǹd only one small fault in it. In referring gto the imminency of danger, the court used the expression "present imminent danger." The statute, Section 3203 General Statutes, in defining justifiable homicide uses the phrase "imminent danger." The statute provides that a homicide, when committed by one in lawful self defense and there shall be a reasonable ground to apprehend a design to commit a felony or do some great personal injury "and there shall be imminent danger" of such design being accomplished, is justifiable.

In the case of Furlow v. State, 72 Fla. 464, 73 South. Rep. 362, tried by the same judge who presided at the trial of this case, we expressed the opinion that the words "imminent, immediate and then present danger" which were substituted in a charge upon self defense for the statutory words "imminent danger" were erroneously used and the judgment was reversed. We undertook to point out that "imminent" danger was not necessarily "immediate and then present." That in the case then being considered Sallie Furlow, who shot and killed

Kate Wells while the latter inflamed with anger was approaching and was within ten or twelve feet of Sallie, was not required by the rule of "imminent" danger to wait until Kate was within striking distance before firing the shot, which the court's charge by the use of the words "immediate and then present danger" would have required. The word "immediate" was the objectionable adjective. In the case at bar the court eliminated the word "immediate," but clung to part of the phrase. We think that the word "present" as used by the judge in the phrase "present imminent danger," did not change for better or worse the meaning of the statute, especially when the facts of the case are considered. According to the defendant the danger to himself was "imminent" also "present," for he said that Land, who was close enough to be struck on the *back* of the head by defendant while facing him and pointing a pistol in the latter's stomach, after being assisted to his feet by Hunt, pointed a pistol over the latter's shoulder in the defendant's *direction*. In that case if there was any danger at all to the defendant it was present if the latter was within range and carrying distance of the pistol held by the deceased who had received a blow upon his head of sufficient force to render him helpless. So we think that the word "present" as used in the charge did not render it reversibly vicious.

The thirty-second and thirty-third assignments of error attack two charges which dealt with the defendant's belief in the existence of danger to himself and the right to interpose the defense of self defense when free from fault in bringing on the difficulty. It is unnecessary to set out the charges in full. The criticism of them in counsel's brief we think is not correct. See Danford v. State, 53 Fla. 4, 43 South. Rep. 593. The charge deal-

ing with the defendant's belief in the existence of danger to himself is peculiarly constructed. The language is: "Unless such belief of danger is real," etc. The judge may have intended to convey the idea that the defendant must have believed that the danger was real. One may or may not believe that danger is real. If he did not believe it to be real and a cautious and prudent man under the same circumstances would not believe the danger to have been real, then in that case the defendant could not be said to have acted in self defense. If this is what was meant the charge was correct. See Smith v. State, 25 Fla. 517, 6 South. Rep. 482; Pinder v. State, 27 Fla. 370, 8 South. Rep. 837; Lovett v. State, 30 Fla. 142, 11 South. Rep. 550; Alvarez v. State, 41 Fla. 532, 27 South. Rep. 40; Lane v. State, 44 Fla. 105, 32 South. Rep. 896; Olds v. State, 44 Fla. 452, 33 South. Rep. 296; Sylvester v. State, 46 Fla. 166, 35 South. Rep. 142.

If it was intended to emphasize the theory that the defendant must have "an honest belief" in the existence of danger, the charge was correct because if he could see that the appearances were deceptive and he was in no real danger, he could not claim the right of self defense merely because a reasonably prudent or cautious man might have been deceived by the false appearance of danger. Sylvester v. State, *supra*. The other charge was free from error and was applicable to the facts. The principles announced have frequently been sustained by this court. See Kennard v. State, 42 Fla. 581, 28 South. Rep. 858; Padgett v. State, 40 Fla. 451, 24 South. Rep. 145; Bassett v. State, 44 Fla. 12, 33 South. Rep. 262; King v. State, 54 Fla. 47, 44 South. Rep. 941.

The charge of the court upon the subject of a reasonable doubt was correct. See Vasquez v. State, 54 Fla. 127, 44 South. Rep. 739; Woodruff v. State, 31 Fla. 320.

12 South. Rep. 653; Brown v. State, 46 Fla. 159, 35 South. Rep. 82.

The thirty-fifth assignment of error as it appears in the record is based upon the court's refusal to give the following charge requested by the defendant: "The reasonableness of the belief or fear of the existence of such peril as will excuse the killing is for you to determine from all the facts and circumstances adduced in evidence." In counsel's brief complaint is made that the above charge was given and argument made to show that it was bad. We have not been referred to the page in the record where the above charge appears to have been given, but it seems to have been requested by defendant and refused.

As the court's refusal to give the requested instruction seems to be in consonance with counsel's view that the charge "is not in accordance with the law of the State," the assignment of error should fail. We think that the court probably refused the instruction because the substance of it had been fully covered in other charges.

The defendant requested the court to charge the jury upon their duty to ascertain and decide from the evidence whether the defendant at the time he fired the fatal shot was surrounded by such a condition of affairs as made it from his standpoint reasonable for a cautious man to believe that it was necessary to fire the fatal shot. The court gave the charge but interlined words directing the jury to first determine whether the defendant was the aggressor in the difficulty and if they found he was not then to decide whether he acted as a cautious man would.

The substance of the instruction as requested was given in the general charge. The amendment made by the court did not render it bad. It is insisted that the

charge should have been given as requested, because the defendant was entitled to an instruction "upon his theory of the matter."

It is required that the instructions to the jury be applicable to the evidence. See Melbourne v. State, 51 Fla. 69, 40 South. Rep. 189; Starke v. State, 49 Fla. 41, 37 South. Rep. 850; Kelly v. State, 44 Fla. 441, 33 South. Rep. 235; Danford v. State, 53 Fla. 4, 43 South. Rep. 593.

No fault can be found with the charge upon the ground that it was not based upon facts in evidence. There was ample evidence to show that the killing of Land was unnecessary, deliberate, cruel and that the defendant was the aggressor from the moment he entered the house until he fired the shot over the shoulder of his friend Hunt who at the time was supporting the deceased upon his feet.

The following instructions were requested by the defendant to be given, but the court refused them, and such refusal is assigned as the thirty-seventh and thirty-eighth errors: 1st. "The Court charges you that the nature of the weapon or instrument used in an assault by one person upon another and the manner of its use, are important considerations for the jury in a prosecution against the person assaulted for killing his assailant, in determining whether the slayer acted in necessary self defense. And that an assault with a deadly weapon raises a presumption of an intent to kill which justifies the person assaulted in using a deadly weapon in defending himself. And if a weapon's use by one person in assaulting another and the manner of its use was such as to be reasonably calculated to produce death or great bodily harm, an intent to do so, which will warrant killing in self defense is presumed." 2nd.

"The court further charges you that a person threatened with an attack, however, is not required to wait until the attack is actually made, but may safely act upon appearances and make the first assault and kill the other if this is necessary, or apparently necessary, to avoid death or great bodily harm from the person whom he kills."

The subject of self defense was fully and correctly covered by the court in the charges given both upon the court's own motion and at the defendant's request.

The first instruction requested and quoted above is not the law as it obtains in this State. The question of necessity for the fatal blow or shot is to be determined by the jury from the evidence and the jury is to say whether a prudent and cautious person under the circumstances would have deemed the shot necessary. The requested instruction makes the fact of an assault with a deadly weapon as a matter of law justification for taking life. The second instruction was fully covered in proper form by the court in other charges.

The court instructed the jury that a person occupying the position of Quarter Boss is clothed with no legal authority to make arrests and has no more power in that regard than any other private citizen. There was no error in that charge.

The following charge was given and forms the basis of the fortieth assignment of error: "I further charge you, gentlemen of the jury, that a deputy sheriff or other officer has no authority to molest, apprehend or attempt to arrest any person, although such person may be guilty of a breach of the peace, unless such offense was committed in the presence of the deputy sheriff or amounted to a felony, unless the deputy sheriff or other officer is authorized to make such arrest by reason of a

warrant duly issued by a court of competent jurisdiction." This instruction did not correctly state the law, (See Carlton v. State, 63 Fla. 1, 58 South. Rep. 486), but we do not see that it was injurious to the defendant. There was no evidence whatever that he attempted to arrest the deceased. The defendant went to the house as an officer to investigate a report as to a breach of the peace, but upon arriving there he did not make any effort to arrest any one; on the other hand he himself said that he looked under the man's hat to see who he was, and then knocked him down when the latter drew a pistol. The giving of the instruction was not reversible error.

The forty-first assignment of error rests upon the following charge: "I further charge you that if you believe beyond a reasonable doubt from the evidence in in this case that Oliver Ward was what is known as quarter boss and also deputy sheriff and you further believe that he, having been advised of some disturbances or breaches of the peace, lawfully went to the house where Arthur Land was at the time of the difficulty and if you further believe that at the time of his arrival that Land was engaged in no breach of the peace or other violation of the law, and if you further believe that Ward approached Land and without provocation, justification or excuse struck Land, and you further believe that a difficulty ensued by reason of and as a result of such striking and in that difficulty Arthur Land was killed by Oliver Ward, then I charge you that Ward cannot plead self defense in justification of his act brought about by his own wrong and to meet a necessity created by his being the aggressor in a difficulty brought about by his wrongful and unlawful act, and you shall find the defendant guilty of such degree of

unlawful homicide as you deem the evidnce warrants."
There was no error in this instruction.

The forty-second assignment of error attacks the following instruction: "The Court further charges you that a person who is the aggressor in bringing on the difficulty, the one who strikes the first blow without legal right and later finds himself in danger of losing his own life in the same difficulty cannot avail himself of the legal. right of self defense." No error was committed in giving it. Considered in connection with the instruction upon the law of self defense and in view of the evidence in the case it was proper.

The forty-third and last assignment of error attacks the verdict upon the ground that it was not supported by the evidence. A discussion of the evidence would be to no purpose. It was amply sufficient to support the verdict.

We have found no error in the trial of the case so the judgment is affirmed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND WEST, J. J., concur.